UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KINZIE ADVANCED POLYMERS, LLC )     Case No. 1:24 CV 1887
d/b/a GROVE BAGS )
                     )
        Plaintiff )    JUDGE SOLOMON OLIVER, JR.
                     )
        v. )
                     )
CALYX CONTAINERS, LLC *et. al,* )
                     )
        Defendants )    <u>ORDER</u>

Currently pending before the court in the above-captioned case is Plaintiff Kinzie Advanced Polymers, LLC d/b/a/ Grove Bags' ("Plaintiff" or "Grove Bags") Motion for Preliminary Injunction ("Motion") (ECF No. 5). The court held a Preliminary Injunction Hearing ("Hearing") on the Motion on May 22, 27, and 28, 2025, during which the court received exhibits from all parties, and heard testimony from Jack Grover ("Grover") and Daniel Jaffe ("Jaffe") on behalf of Grove Bags, Simon Knobel ("Knobel") on behalf of Defendant Calyx Containers, LLC ("Calyx"), and Defendant Michael Ryan Tatum ("Tatum"). (ECF No. 40.) For the reasons that follow, the court grants in part and denies in part the Motion.

# I. BACKGROUND

This action involves two competing cannabis packaging companies owned and operated by former college friends and fraternity brothers,[1] and a third person who worked for one, and now works for the other. On May 22, 27, and 28, 2025, the court held a Preliminary Injunction Hearing, during which the court heard testimony from all parties, and received exhibits. The following facts are derived from the parties' preliminary injunction filings (ECF Nos. 5, 8, 13, 16, 18), testimony and exhibits presented at the Hearing (ECF Nos. 48–51), and the parties' closing briefs (ECF Nos. 41–43). The court also references the parties' personal jurisdiction arguments in Defendants' Motions to Dismiss (ECF Nos. 19, 20) and Plaintiff's Opposition Briefs (ECF Nos. 23, 24).

**A.     Factual Background**

   *1.     The Parties*

        a.     Grove Bags

Plaintiff company, Grove Bags, was founded by Jacob Grover in 2016 as an Ohio limited liability company. Since its founding, the company has maintained its principal place of business and warehouse in Cuyahoga County, Ohio. (Jaffe Prelim. Inj. Decl. ¶¶ 5–8, ECF No. 5-1.) Grove Bags develops and distributes cannabis packaging materials for commercial and retail customers. (*Id.* at ¶¶ 15–16.) The company characterizes itself as the "market leader in the cannabis industry for packaging products[,]" chiefly because its product, TerpLoc, is a "first of its kind" cannabis film that "create[s] the optimal cannabis climate in every package." (*Id.* at ¶¶ 14, 16–17.) Grove Bags does not manufacture TerpLoc itself, nor is the product patented. (Tr. at PageID 982–84.) However, parts

---

[1]     Calyx CEO, Simon Knobel, and Calyx President, Alex Gonzalez, attended college with Jack Grover and Dan Jaffe of Grove Bags, where all four were friends and in the same fraternity. (Knobel Prelim. Inj. Decl. ¶ 5, ECF No. 8-1.)

of its production are patented, such as the chemical makeup. (*Id.*)

Grove Bags employs approximately 30 people, with most living in and working from Ohio, including Grover as CEO, Jaffe as CFO, and others of the company's leadership team. (Pl. Closing Br. at PageID 817, ECF No. 42.) Every employee and independent contractor/consultant signs an employment agreement that includes confidentiality, non-solicitation, and non-compete obligations. (*Id.* at PageID 819.) The company also gives each employee or consultant a handbook that details how to protect the business's confidential information. (*Id.*) It further limits employee access to certain types of information, and password protects confidential information. (*Id.*) When an employee or consultant leaves the company, they must return all Grove Bags property and equipment. (Jaffe Prelim. Inj. Decl. ¶ 31.) Grove Bags customers, however, are not bound by confidentiality agreements, and so may freely share with others pricing information they receive from Grove Bags. (Tr. at PageID 990.)

Grove Bags engages in a variety of marketing and sales tactics to promote its packaging products. Sales team members receive training on Grove Bags' products, sales techniques, and managing and maintaining the company's customer database. (Jaffe Prelim. Inj. Decl. ¶ 34.) One sales tactic employees use is comparative selling, sometimes called the "Pepsi Challenge," whereby Grove Bags sends a sample of its product to potential customers to compare with their current packaging. (Tr. at PageID 899–90, 987.) Grove Bags employees also attend cannabis industry trade shows, including MJBizCon, a three-day event attended by 30,000 cannabis industry executives from around the globe. (Jaffe Prelim. Inj. Decl. ¶¶ 77–78.) Another mechanism through which the company generates customer leads is by subscribing to Cannabiz Media ("Cannabiz"), a public online database housing contact information and data on cannabis companies licensed to operate in

the United States. (Tr. 909, 985; Calyx Closing Br. at PageID 808.) Grove Bags uses Cannabiz to identify prospective customers. (*Id.*) Further, many of Grove Bags' current customers are listed in the database.(*Id.*)

> b.      Calyx Containers

Defendant company, Calyx Containers, also founded in 2016, is a Colorado limited liability company with its principal place of business and manufacturing facility in Utah. (Knobel Mot. to Dismiss Decl. ¶¶ 5–6, ECF No. 19-1.) Calyx also participates in the cannabis packaging industry. (*Id.* at ¶ 7.) Initially, Calyx focused on customer point-of-sale rigid packaging, such as hard containers made of plastic or glass, which was distinct from Grove Bags' flexible packaging. (*Id.*) Around 2023, Calyx began working on a flexible packaging product that used a similar modified atmospheric packaging ("MAP") film as Grove Bags used in its products. (Knobel Prelim. Inj. Decl. ¶¶ 15–17.) The product, called Calyx Cure, was created in Calyx's laboratories by Calyx employees, and differs from Grove Bags' product in the following ways: it includes a flat bottom, rectangular pouch shape, additional film layers, a different zipper design, and uses different mechanisms, additives, chemical composition and layering, humidity targets, and temperatures. (*Id.* at ¶ 21; Calyx Closing Br. at PageID 810.)

Calyx's leadership team and most of its employees live and work in Utah. (Knobel Mot. to Dismiss Decl. ¶¶ 6–7.) The company has one Ohio-based employee, but that employee's work does not involve servicing, increasing, or developing any customers or business specific to Ohio. (*Id.* at ¶ 9.) About two percent of Calyx's revenue comes from Ohio customers, but the company maintains that its business in Ohio is not continuous or systematic. (*Id.* at ¶ 12.)

Calyx engages in similar marketing tactics as Grove Bags, including sending samples of its

product to prospective customers, attending MJBizCon, and subscribing to and using Cannabiz Media for researching potential customers. (Tr. at PageID 1194, 1211; Knobel Prelim. Inj. Decl. ¶ 35.) The company also uses a regional sales model in which eight different sales employees are responsible for specific territories, a sales structure Calyx maintains is common across industries. (Knobel Prelim. Inj. Decl. ¶ 36.)

c.    Michael Ryan Tatum

Defendant Michael Ryan Tatum, resides in and works from Colorado. (Tatum Prelim. Inj. Decl. ¶ 3, ECF No. 16-1.) He has been active in the cannabis industry since 2014, largely working as a consultant through his company, Cultivated Synergy, LLC. (*Id.* at ¶ 5.) In September 2020, Tatum began consulting for Grove Bags. (Pl. Ex. 1.) His consulting agreement ("Grove CA") detailed the services he would provide Grove Bags, explained Tatum's obligations related to confidential information, and discussed compensation. (*Id.*) The Grove CA also included non-competition and non-solicitation clauses, as well as a governing law provision establishing Ohio as the choice of forum and choice of law for any disputes arising from the agreement. (*Id.* at pg. 4–5.) Lastly, the Grove CA noted that the confidentiality, non-competition, non-solicitation, and governing law provisions, among others, extended beyond termination of the agreement. (*Id.* at pg. 6.)

On December 7, 2020, Grove bags hired Tatum full-time as the company's Chief Commercial Officer. (Pl. Ex. 2.) In January 2021, Tatum signed his second Employment Agreement ("EA") and was named Director of Business Development. (Pl. Ex. 3.) Tatum entered his third EA with Grove Bags in February 2023, and once again took on the role of Chief Commercial Officer. (Pl. Ex. 4.)  Like the Grove CA, every EA included provisions detailing how Tatum must treat confidential information, his obligations under non-competition and non-solicitation restrictive

-5-

covenants, and a governing law provision making Ohio the forum and choice of law for any lawsuit brought in connection with the EA. (*Id.*) None of these provisions changed from EA to EA, so when Tatum entered his third and final EA in February 2023, he had already seen and agreed to the restrictive covenants and governing law provisions twice before. Moreover, Tatum had time to review each EA and never objected to the provisions now in dispute. (Tr. at PageID 922.)

As the Director of Business Development from January 2021 to February 2023, Tatum managed Grove Bags' outside sales team, had access to the company's customers and their relevant information, and knew about the company's products, pricing, cost of goods sold, prospective customers, business strategy, and finances. (Jaffe Prelim. Inj. Decl. ¶ 49.) Despite his title changing to Chief Commercial Officer in the February 2023 EA, Tatum's duties remained consistent. (*Id.* at ¶ 52.) In addition to managing the sales team, Tatum also traveled on behalf of Grove Bags, often representing it during visits with current and prospective customers, as well as at cannabis industry events such as MJBizCon. (*Id.* at ¶ 55.)

Tatum signed his final agreement, the Severance Agreement ("SA"), with Grove Bags on August 25, 2023. (Pl. Ex. 5.) Plaintiff and Tatum dispute the events leading up to Tatum's departure, including the amount of time Tatum had to review and sign the SA as well as why Tatum left. The SA states that Tatum voluntarily resigned from his position with Grove Bags, which Jack Grover corroborated in his testimony. (Pl. Ex. 5 at pg. 1; Tr. at PageID 924, 926, 1007–08, 1010–12.) However, Tatum testified he was terminated without explanation, and given only 24 hours to sign the SA after receiving it during a last-minute meeting with Grover and Jaffe right before he was scheduled to fly home to Colorado from Ohio. (Tr. at PageID 1024–25; Tatum Closing Br. at PageID 827.) How exactly the termination unfolded need not be settled to decide whether a preliminary

injunction should issue, because it is undisputed that the SA included a provision requiring Tatum's continued compliance with the confidentiality clause and restrictive covenants included in his prior EAs, and the same governing law clause establishing Ohio as the forum and choice of law for any dispute or matter arising from the SA. (Pl. Ex. 5 at pg. 2–3.)

  2. *Tatum's Post-Grove Bags Work*

  After leaving Grove Bags, Tatum returned to consulting through his Colorado-based LLC, Cultivated Synergy Strategies, Ltd. (Tatum Prelim. Inj. Decl. ¶ 12.) His clients included those working in mushrooms, nutraceuticals, software development, and Defendant Calyx. (*Id.*) Prior to the Hearing, Plaintiff asserted it learned that Tatum was working for Calyx shortly before it filed the instant lawsuit in October 2024. (Jaffe Prelim. Inj. Decl. ¶ 67.) Calyx claimed it began working with Tatum in September 2024 pursuant to a consulting agreement. (Knobel Prelim. Inj. Decl. ¶ 23.) However, during the Hearing, Plaintiff introduced a complaint filed by Tatum and Calyx against Grove Bags in the District of Colorado ("Colorado Complaint"), which stated that Calyx first approached Tatum about working for it in October 2023. (Pl. Ex. 18 at ¶ 26.[2]) Tatum allegedly declined that offer because he "believ[ed] he was bound by the terms of the restrictive covenants set forth in his [Grove Bags] Employment Agreement[.]" (*Id.* at ¶ 27.) Calyx allegedly approached Tatum again in January 2024 with another job offer, which Tatum declined based on his Grove Bags EA. (*Id.* at ¶¶ 28–29.) Tatum and Calyx then state in the Colorado Complaint that,

> both Tatum and Calyx began evaluating the enforceability of the restrictive covenants contained in the Employment Agreement. Following their investigations, Tatum and Calyx discovered that Colorado Law disfavors restrictive covenants and that the provisions

---

[2] A review of the Colorado District Court Docket reveals Tatum and Calyx filed an amended complaint on June 26, 2025. *See* Case No. 1:25-cv-1321-CYC.

> contained in the Employment Agreement may be unenforceable under applicable [Colorado] law. After making this determination, but erring on the side of caution, Tatum accepted a lesser role with Calyx as an independent contractor rather than an employee in September 2024.

(Pl. Ex. 18 at ¶ 30–32.) During the Hearing, however, Tatum and Calyx, acknowledged there were some errors in the Colorado Complaint that the parties were in the process of fixing through an amended complaint. (Tr. at PageID 1060–61, 1131.) Even so, it is undisputed that Tatum signed a consulting agreement ("Calyx CA") with Defendant Calyx in late August 2024. (Tatum Ex. A.)

Under the Calyx CA, Tatum agreed to provide a number of services, including "Go-to-Market" Strategy Development, Sales Enablement–such as creating sales collateral and training for sales staff, and Market Analysis by conducting market research and gathering customer feedback. (Tatum Ex. A pg. 1.) In exchange for his services, Calyx agreed to pay Tatum a $1,400 signing bonus, and hourly rate of $35 per hour, and seven percent commission on any net new business Tatum brought into the company. (*Id.* at pg. 2.) The Calyx CA also included a confidentiality provision, a clause whereby Tatum represents he is under no contractual or legal obligations that would prohibit him from working for Calyx, and a governing law section establishing Colorado as the choice of law for any disputes. (*Id.* at pg. 3.) Although the Calyx CA terminated December 4, 2024, Tatum continues to work as a consultant for Calyx under the terms of the original Calyx CA. (Tr. at PageID 1089–91.)

**B.    Procedural Background**

Plaintiff filed a seven-count Complaint (ECF No. 1) on October 29, 2024, alleging Breach of Contract - Employment Agreement (Count I) and Breach of Contract - Severance Agreement (Count II) against Defendant Michael Ryan Tatum, as well as Misappropriation of Trade Secrets

(Count III), Tortious Interference with Economic and/or Business Relations (Count IV), Civil Conspiracy (Count VI), and Injunctive Relief (Count VII) against Tatum and Calyx, and Tortious Interference with Economic, Contract, and/or Business Relations (Count V) against Calyx. Plaintiff later filed an Amended Complaint (ECF No. 9) on January 10, 2025, asserting the same seven counts, but adding one for Deceptive Trade Practices against Calyx and Tatum.[3] (Am. Compl. at PageID 274.)

On December 24, 2024, Plaintiff filed the instant Motion for Preliminary Injunction (ECF No. 5). Defendant Calyx filed its Opposition (ECF No. 8) to the Motion on January 7, 2025, to which Plaintiff filed its Reply in Support (ECF No. 13) on January 14, 2025. Tatum filed his Opposition (ECF No. 16) to the Motion on January 16, 2025, to which Plaintiff filed its Reply in Support (ECF No. 18) on January 23, 2025. Following a Case Management Conference ("CMC") with counsel for the parties on April 30, 2025, the court scheduled a Preliminary Injunction Hearing to take place on May 22, 27, and 28. (ECF Nos. 33, 35.) Between the CMC and the Hearing, Defendants moved to stay discovery (ECF Nos. 30, 31) until the court ruled on their respective Motions to Dismiss the Amended Complaint (ECF Nos. 19, 20) for lack of personal jurisdiction. The court stayed discovery for 30 days, but then lifted the stay against Tatum following Tatum's request for information and documents from Plaintiff in relation to his Colorado Complaint. (ECF No. 35.) The Hearing concluded on May 28, 2025 and the parties submitted their Closing Briefs on June 6, 2025. (*See* ECF Nos. 41–43.) Plaintiff's Motion is now ripe for review.

## II. LEGAL STANDARD

---

[3]     The parties stipulated during the Hearing that Plaintiff's Deceptive Trade Practices claim was not part of the preliminary injunction. (Tr. at PageID 996.)

A preliminary injunction under Federal Rule of Civil Procedure 65 "is an extraordinary and drastic remedy." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). The moving party therefore must show that the circumstances clearly demand it. *Id.* Courts consider four factors when deciding whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Id.* (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). These factors apply in aggregate and must be balanced rather than treated as "prerequisites to be met." *Id.* But while no single factor is controlling, the first two—likelihood of success on the merits and irreparable harm—predominate the preliminary injunction analysis. *See O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020).

### III. DISCUSSION

Grove Bags seeks a preliminary injunction that (1) prohibits Tatum and Calyx from using or disclosing its confidential business information and trade secrets, and (2) enjoins Tatum from working for or performing services for Calyx and requires that he fully comply with the Severance Agreement and 2023 Employment Agreement. (Mot. at PageID 79.) Defendant Calyx argues that a preliminary injunction should not issue primarily because Plaintiff cannot show a strong likelihood of success on the merits given this court lacks personal jurisdiction, and because Plaintiff failed to show it has been irreparably harmed. (Calyx Closing Br. at PageID 803.) Defendant Tatum also argues the court lacks personal jurisdiction over him, and that Plaintiff failed to show irreparable

harm. (Tatum Closing Br. at PageID 830.) But he primarily challenges the merits of Plaintiff's

breach of contract claims on the grounds that Colorado law makes the disputed Agreements void and

unenforceable. (*Id.*)[4] Although the choice of law question applies only to the breach of contract

claims against Tatum, the court addresses the issue first as both Defendants vehemently assert that

Colorado law, not Ohio, governs this case.

**A.      Choice of Law**

A federal court exercising diversity jurisdiction applies the choice of law rules of the forum

state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *Union

Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022). Here, the court sits in Ohio, and

so it will apply Ohio's choice of law rules. Ohio courts follow Sections 187 and 188 of the

---

[4]      In his Closing Brief (ECF No. 43), Tatum argues that Plaintiff's Exhibit 9 should
be excluded because it is neither certified, nor did Plaintiff offer evidence to
authenticate it. (Tatum Closing Br. at PageID 829.) Plaintiff's Exhibit 9 is a
transcript of a conversation between Tatum and David Thode of Cannabiz Media.
During the Hearing, Plaintiff referenced the exhibit in support of its argument that
Tatum had been working with Calyx for months prior to entering a consulting
contract in August 2024. (Pl. Closing Br. at PageID 821; Tr. at PageID 106.) In
the Sixth Circuit, parties should stipulate to the accuracy of a transcript of a
recording. *Am. Signature, Inc. v. Extreme Linen, LLC*, No. 2:12-CV-00601, 2015
WL 1476751 (S.D. Ohio Mar. 31, 2015) (citing *United States v. Vinson*, 606 F.2d
149, 155 (1979)). If there is no stipulation, then "the transcriber should verify that
he or she has listened to the [recording] and accurately transcribed its content. The
court should also make an independent determination of the accuracy of the
transcript against the tape." *Extreme Linen*, 2015 WL 1476751 at *13 (quoting
*United States v. Robinson*, 707 F.2d 872, 878–79 (6th Cir. 1983) (internal
quotations omitted)). However, this standard is generally applicable only when the
court is deciding a case on the merits—such as at trial or at the summary judgment
stage. *Ridge Corp. v. Kirk Nat'l Lease Co.*, No. 2:23-CV-03012, 2024 WL
4363226 (S.D. Ohio Sept. 30, 2024). Whereas at the preliminary injunction stage,
"district courts do not require stringent adherence to rules of evidence." *Id.* at *1.
Thus, the court can consider the unauthenticated transcript provided by Plaintiff in
support of its Motion.

-11-

Restatement (Second) Conflict of Laws to decide which law applies in contract disputes. *Wise v. Zwicker & Assoc., P.C.*, 780 F.3d 710, 714 (6th Cir. 2015). Under these rules, courts will generally apply and find enforceable choice of law provisions governing the parties' contractual rights and duties. *Extracorporeal All., L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1036 (N.D. Ohio 2003), aff'd, 113 F. App'x 98 (6th Cir. 2004); Restatement (Second) of Conflict of Laws § 187.

The Agreements at issue contain the following choice of law provision: "This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio." (Pl.'s Exs. 4, 5.) Defendant Tatum argues that the court should set aside the provision because Colorado Revised Statute § 8-2-113 provides significant protections to Colorado citizens from restrictive employment covenants, including prohibiting out-of-state choice of law clauses. The relevant section of the Colorado statute provides:

> A covenant not to compete that applies to a worker who, at the time of termination of employment, primarily resided or worked in Colorado may not require the worker to adjudicate the enforceability of the covenant outside of Colorado. Notwithstanding any contractual provision to the contrary, Colorado law governs the enforceability of a covenant not to compete for a worker who, at the time of termination of employment, primarily resided and worked in Colorado.

Colo. Rev. Stat. § 8-2-113(6). Tatum contends this section renders the Ohio choice of law provision in his contracts void and unenforceable. (Tatum Closing Br. at PageID 831.) Defendant Calyx echos this argument, stating, that to the best of its knowledge, "no Court to date has ever found that C.R.S. § 8-2-113(6) [...] does not operate to bar enforcement of the Ohio choice of law provision here, as the Colorado legislature intended." (Calyx Closing Br. at PageID 811.) This argument is not well-taken.

-12-

The court finds only one non-Colorado case that directly considers the effect of § 8-2-113(6) on an out-of-state choice of law clause, and it does not hold that this provision of the Colorado statute makes non-Colorado choice of law provisions void. *See Access Pro Med., LLC v. Hartman*, No. CV 125-063, 2025 WL 1548745 (S.D. Ga. May 30, 2025). In *Access Pro Medical*, a Colorado defendant, like Tatum here, argued that his non-compete agreement with a Georgia company was void under Colorado law because it did not comply with the requirements of § 8-2-113, and the statute required that such covenants be governed by Colorado law. 2025 WL 1548745, at *3. The Georgia district court rejected the defendant's argument, noting that, "Defendant does not explain why the Court should use Colorado law as the starting point rather than the law of the forum state of Georgia[,]" and found the Georgia choice of law provision valid and governing the parties' contract dispute. *Id.*

A South Dakota court reached a similar conclusion in a case decided before the Colorado statute was amended to require non-compete agreements be governed by Colorado law. In *gpac, LLP v. Andersen*, No. 4:21-CV-4201-LLP, 2022 WL 1469388 (D.S.D. May 10, 2022), the Colorado defendants asserted that their non-compete agreements were unenforceable under Colorado law because the state's law and policy, specifically § 8-2-113, strongly disfavor them. The court applied South Dakota's choice of law principles, which, like Ohio, use Section 187 and 188, and concluded that the forum state had a substantial relationship to the parties and the agreement, and Colorado did not have a materially greater interest despite its strict non-compete statute. 2022 WL 1469388, at *6–7. *But see BDO USA, P.C. v. Rojas*, No. 24 CIV. 101 (CM), 2024 WL 3236822 (S.D.N.Y. June 27, 2024), reconsideration denied, No. 24 CIV. 101 (CM), 2024 WL 3729581 (S.D.N.Y. Aug. 8, 2024) (applying New York choice of law principles and determining Colorado law governs because

-13-

New York does not have a reasonable relationship compared to Colorado).

Accordingly, like the Georgia, South Dakota, and New York district courts, this court will look to the forum state's choice of law principles, here Ohio, to determine whether the Ohio choice of law provision in Tatum's Agreements should be set aside.

As previously mentioned, Ohio has adopted Sections 187 and 188 of the Restatement (Second) of Conflict of Laws to evaluate choice of law issues in contract disputes. Section 187 instructs courts to respect choice of law provisions, unless an exception applies. *Wise*, 780 F.3d at 715. A court should not enforce the provision if:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of the Restatement (Second) of Conflict of Laws], would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* (citing Restatement (Second) of Conflict of Laws § 187(2)). Comment (e) to the Restatement provides examples of when a substantial relationship between the parties or transaction and the chosen state exists:

> [W]here performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business. The same will also be the case when this state is the place of contracting except, perhaps, in the unusual situation where this place is wholly fortuitous and bears no real relation either to the contract or to the parties.

Restatement (Second) of Conflict of Laws § 187 cmt. e. Here, Grove Bags is an Ohio limited liability company with its principal place of business in Ohio. This is sufficient to establish a "substantial

-14-

relationship" between the parties and the chosen state. *Id. See also Century Business Servs., Inc. v. Barton*, 967 N.E.2d 782, 794 (Ohio Ct. App. 2011) (recognizing a substantial relationship between the parties and the chosen state where parent company of one of the contracting parties is based in Ohio, and other contracting party is not). Thus, to set aside the Ohio choice of law provision, the court must find that Colorado law is the applicable state law under § 188, that Colorado has a materially greater interest than Ohio in determining the issue, and that enforcement of the Ohio choice of law provision would be contrary to Colorado's fundamental policy.

      *1.     Would Colorado Law Apply Absent the Ohio Choice of Law Provision?*

Section 188 of the Restatement provides that, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 188 (1971). To determine which state has the most significant relationship, the court applies the following factors: "the place of contracting," "the place of negotiation of the contract," "the place of performance," "the location of the subject matter of the contract," and "the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* Application of Section 188 of the Restatement "requires a sensitive, fact-specific analysis." *Wise*, 780 F.3d at 718.

The place of contracting and of negotiation of the contract is unclear from the record given the Agreements were signed by both parties electronically via DocuSign. (*See* Pl.'s Exs. 2, 3, 4, 5.) During the Hearing, Tatum testified he was presented with a physical copy of the Severance Agreement (Pl. Ex. 5) at Grove Bags's office in Ohio, but there was also testimony that he did not sign via DocuSign until about three weeks later, when he would have been back in Colorado. (Tr.

-15-

at PageID 1024–25.) These factors standing alone, however, are less important "when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." *Stone Surgical*, 858 F.3d at 390 (citing Restatement (Second) of Conflict of Laws § 188, cmt. e.). Thus, these factors neither weigh for nor against Ohio as the state with the most significant relationship.

Turning to the place of performance, the court finds that Colorado is the primary place of performance for Tatum's work on behalf of Grove Bags. Although a full-time employee for Grove Bags, Tatum worked remotely from Colorado and traveled to Ohio at least four times a year for specific company events and trainings. (Tr. at PageID 905.) However, the record indicates Tatum performed his Grove Bags duties from other states as well, particularly where he was representing the company at a trade show or conference. (Jaffe Prelim. Inj. Decl. ¶ 55.) The record also shows that when Tatum left Grove Bags he was managing between four and six Ohio employees. (Pl.'s Closing Br. at PageID 817.) Even so, there is no evidence in the current record contradicting that Colorado was Tatum's home base while he was fulfilling his marketing and sales duties for Grove Bags. Accordingly, the court finds this factor weighs slightly in favor of Colorado.

With regard to the location of the contract's subject matter, specifically the non-competition clause, this factor does not weigh for or against Colorado. Here, the non-competition clause applies to work in the United States or Canada, but limits the type of work subject to the clause to "any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries." (Pl.'s Ex. 4 at pg. 4.) This clause is different from the type at issue in *Stone Surgical*, where the subject matter of the non-compete provision favored Louisiana over Ohio as the state with the most significant relationship to the

-16-

transaction because it told the employee "what he can and cannot do in his Louisiana sales territories, should he leave his employment with Stryker." 858 F.3d at 390. The Sixth Circuit determined that this geographic limitation comported with § 188, comment e, which says, in relevant part:

> When the contract ... affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant. The state where the ... risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the ... risk as important.

*Stone Surgical*, 858 F.3d at 390 (quoting Restatement (Second) of Conflict of Laws § 188, cmt. e). The instant non-compete provision does not restrict Tatum's ability to work in Colorado or Ohio specifically, rather it restricts his ability to work for a company that, like Grove Bags, focuses on the "manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries." (Pl.'s Ex. 4 at pg. 4.) Thus, the location of the contract's subject matter does not weigh for or against Colorado.

Lastly, the domicile of the parties does not favor one state over the other. Grove Bags is incorporated and has its principal place of business in Ohio, and Tatum is a resident of Colorado. Thus, this factor has little impact on the § 188 analysis in this case.

The court finds by the smallest of margins that the § 188 analysis makes Colorado the state with the most significant relationship to the transaction and parties. Most of the factors did not weigh in favor of Colorado or Ohio, but Colorado is the state where Tatum preformed the majority of his duties while working for Grove Bags. Thus, absent the parties choice of law provision, the court concludes that applying Colorado law would be consistent with § 188 of the Restatement (Second) of Conflict of Laws. But this determination does not end the court's analysis. The court must also find that Colorado has a materially greater interest in the dispute and that application of Ohio law

would be contrary to a fundamental policy of Colorado.

>    2.    *Does Colorado Have a Materially Greater Interest?*

To determine which state has a materially greater interest in the outcome of the action, Ohio courts evaluate the relationship of the two states to the agreement. *Wise*, 780 F.3d at 716. Even when another state's law would govern absent a choice of law clause, "it does not necessarily follow that [Colorado's] interest is *materially* greater than that of [Ohio]." *Stone Surgical*, 858 F.3d 390 (emphasis in the original). Courts look at "the citizenship of the parties to the contract; the locations of creation, negotiation, and performance of the contract; and the location of the parties with an interest in the specific provision of the contract," to determine if the non-choice of law state has a materially greater interest. *Wise*, 780 F.3d at 716. As previously discussed, one party to the disputed Agreements is an Ohio citizen (Grove Bags), while the other (Tatum) is a Colorado citizen. The location of contract creation and negotiation is similarly unhelpful because the parties executed the Agreements electronically and the record appears devoid of facts specific to where or how the parties negotiated the contracts. The court previously found that the place of performance is primarily Colorado, but that factor alone does not give Colorado a materially greater interest in the dispute than Ohio.

Lastly, the court evaluates whether Colorado's interest in the specific provisions involved in this case are materially greater than Ohio's interests. The disputed provisions in Plaintiff's breach of contract claims are the restrictive covenants governing Tatum's legal obligations following his employment with Grove Bags. Tatum maintains Colorado's interest is materially greater because the state provides significant protections to its citizens from restrictive employment covenants, such as non-compete and non-solicitation agreements. (Tatum Closing Br. at 830.) But, "[t]he simple fact

-18-

that one state might have greater protections, even significantly greater protections, is not sufficient to find that that state has a materially greater interest than another interested state." *CBIZ, Inc. v. Cryan*, No. 1:24-CV-1027, 2024 WL 5443173, at *8 (N.D. Ohio July 23, 2024) (quoting *Viking Grp., Inc. v. Grasser*, No. 1:22-CV-933, 2023 WL 4824454 (W.D. Mich. Jan. 19, 2023)).

In *Viking*, the court considered whether Colorado or Michigan law should apply to the plaintiff's breach of contract claim against a former employee who allegedly violated a non-compete provision.[5] The defendant employee, like Tatum here, argued that Colorado had a materially greater interest than Michigan because, "where a state law has substantial protection for its residents and application of another state's law would remove those protections, the state with the more protective law tends to have a materially greater interest." *Viking* 2023 WL 4824454, at *4. In rejecting the defendant's argument, the court explained that while Colorado has an interest in protecting its citizens from certain employment restrictions, "Michigan has an interest in protecting its companies from breaches of employment agreements." *Id.* Thus, even if Colorado's interests in issues of non-compete agreements otherwise prohibited by Colorado law is equal or somewhat greater than Michigan, "they are not materially so." *Id*. Here, the court similarly concludes that Colorado's interests in restricting non-compete agreements are not materially greater than Ohio's interest in protecting its companies, like Grove Bags, from breaches of employment agreements. Accordingly, the court concludes that Colorado does not have a materially greater interest than Ohio in the resolution of the instant contract dispute.

   3.     *Would Application of Ohio Law be Contrary to a Fundamental Colorado Policy?*

---

   [5]     Although *Viking* involved Michigan law, Michigan also analyzes choice of law issues pursuant to Sections 187 and 188 of the Restatement (Second) of Conflict of Laws.

The failure to satisfy any one of the elements of the § 187(2) exception to enforcing a choice of law provision ends the court's analysis. Thus, even if Colorado restricts an employer's use of non-compete agreements more than Ohio does, the court "need not opine on whether these two fundamental policies conflict." *Stone Surgical*, 858 F.3d at 391.

The court concludes that neither exception to § 187 of the Restatement (Second) of Conflict of Laws applies because the chosen state, Ohio, has a substantial relationship to the parties, and Colorado does not have a materially greater interest in the determination of the particular issue. Accordingly, the court will not set aside the Ohio choice of law provision included in Defendant Tatum's Employment and Severance Agreements with Plaintiff Grove Bags. Ohio law, therefore, applies to Plaintiff's breach of contract claims against Defendant Tatum.[6]

## B.      Personal Jurisdiction

Next, the court addresses Defendants' personal jurisdiction arguments. Both Calyx and Tatum moved to dismiss Plaintiff's Amended Complaint for lack of personal jurisdiction (ECF Nos. 19, 20). Defendants maintained these arguments throughout the Preliminary Injunction Hearing and the parties' respective briefings. Therefore, the court addresses the personal jurisdiction issue because it is inseparable from the preliminary injunction analysis.

In a diversity action, federal courts apply the law of the forum state to resolve questions of personal jurisdiction. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). A plaintiff

---

[6]      The parties do not dispute that Ohio law governs Plaintiff's other claims against Defendants. As such, the court will apply Ohio law to determine whether Plaintiff succeeds on the merits in its Misappropriation of Trade Secrets (Count III), Tortious Interference with Economic and/or Business Relations (Count IV), Tortious Interference with Economic, Contract, and/or Business Relations (Count V), or Civil Conspiracy (Count VI) claims.

must establish the court's personal jurisdiction over each individual defendant. *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014). Thus, the court applies Ohio law to determine whether the court has personal jurisdiction over Defendants Tatum and Calyx separately.

The exercise of personal jurisdiction is proper when it satisfies Ohio's long-arm statute and constitutional due process. *Rowlette*, 228 F.3d at 721. However, personal jurisdiction is a waivable right, and contracting parties can consent to the personal jurisdiction of a particular court by including a forum selection clause. *Preferred Capital, Inc. v. Assoc. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006) (citing *Kennecorp Mortg. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.*, 610 N.E.2d 987, 988 (Ohio 1993)). A party seeking to assert personal jurisdiction must show that such jurisdiction exists. *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012) (quoting *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002)). The Sixth Circuit explains that, "[t]he weight of [the] burden ... depends on whether the trial court chooses to rule on written submissions or to hear evidence on the personal-jurisdiction issue..." *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). If the court relies solely on the parties' written submissions, then it considers the pleadings and affidavits in the light most favorable to the plaintiff, and the plaintiff need only make a *prima facie* showing that personal jurisdiction exists. *Id.* However, if an evidentiary hearing is had on the issue, then a preponderance-of-the-evidence standard applies. *Schneider*, 669 F.3d at 697. In this case, the court conducted a preliminary injunction hearing where some of the parties' testimony was directed at the personal jurisdiction issue. However, the purpose of the hearing was *not* to hear the Plaintiff's evidence on personal jurisdiction. Neither Defendants nor Plaintiff discuss what standard the court should apply given it has before it testimony and written

-21-

submissions. Accordingly, because the court did not specifically hold an evidentiary hearing on the issue, the court concludes that it takes all pleadings and affidavits in the light most favorable to Plaintiff, and Plaintiff need only make a *prima facie* showing that personal jurisdiction exists.

The disputed contracts between Plaintiff and Tatum contain a forum selection clause, which, if valid and enforceable, ends the personal jurisdiction analysis against Tatum. As for Calyx, there is no agreement; thus, Plaintiff must show that personal jurisdiction exists based on Ohio's long-arm statute and constitutional due process.

### 1. Defendant Michael Ryan Tatum

Defendant Tatum argues the court lacks personal jurisdiction over him because the forum selection clause included in the disputed Agreements is unenforceable, and Plaintiff makes no allegations involving conduct by Tatum in Ohio. (Tatum Mot. to Dismiss at PageID 440–42, ECF No. 20.) Plaintiff contends the forum selection clause is valid, and even absent the clause, personal jurisdiction is still proper based on Ohio's long-arm statute and constitutional due process. (Pl. Opp'n to Tatum Mot. to Dismiss at PageID 593, ECF No. 24.)

As previously noted, Ohio law controls the court's determination of personal jurisdiction in this case. In Ohio, forum selection clauses between commercial entities are presumptively valid, and Ohio courts will enforce them absent fraud or overreaching. *Kennecorp*, 610 N.E.2d at 989. *See also Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369 (6th Cir. 1999) (upholding forum selection clause between two businesses). This presumption of validity, however, does not apply to employment contracts. *Buckeye Check Cashing of Arizona, Inc. v. Lang*, No. 2:06-CV-792, 2007 WL 641824, at *4 (S.D. Ohio Feb. 23, 2007). Thus, Ohio courts must consider other factors to determine the clause's enforceability. An Ohio court will not enforce the forum selection clause in an

employment contract if the party challenging it shows:

> (1) that the contract was the result of fraud or overreaching; (2) that enforcement would violate the strong public policy of the forum state; and (3) that enforcement under the particular circumstances of the case would result in litigation in a jurisdiction so unreasonable, difficult and inconvenient that the challenger would for all practical purposes be deprived of his day in court.

*Id.* at *5 (citing *Barrett v. Picker Internatl., Inc.*, 589 N.E.2d 1372, 1374 (Ohio Ct. App. 1990)). Neither party addresses these factors when arguing the enforceability of the disputed forum selection clause. Even so, based on the parties' briefings and testimony during the Hearing, there is enough in the record to evaluate each.

The forum selection clause at issue reads, in relevant part,

> Any suit involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

(Pl. Ex. 4 at pg. 11; Pl. Ex. 5 at pg. 3.) First, overreach is shown where a disparity in bargaining power was used to take unfair advantage of an employee. *Buckeye*, 2007 WL 641824, at *6–7. But, making an employment offer contingent on signing an employment agreement does not constitute overreach. *See e.g., Contech Const. Prods., Inc. v. Blumenstein*, No. 1:11CV878, 2012 WL 2871425, at *7 (S.D. Ohio July 12, 2012) (finding that there was no overreach because the defendant knew that his job offer was contingent on signing the agreement). In *Buckeye*, the plaintiff employer, an Ohio corporation doing all of its business in Arizona, sought to enforce an Ohio forum selection clause in its breach of contract suit against Arizona-based former employees for alleged violations of a non-competition, nondisclosure, and non-solicitation agreement. *Buckeye*, 2007 WL 641824, at *1. Examining the first factor, the court determined overreach existed because defendants held "modest-

-23-

paying, lower-level jobs, not high-level corporate positions where the applicants could be expected to have a greater degree of bargaining power or sophisticated knowledge about contract terms." *Id.* at *6. Furthermore, the employees were not informed of or asked to sign the agreement until after they had left their previous jobs and started working for the plaintiff. *Id.* at *7. Considered together, these facts demonstrated overreach and weighed in favor of nonenforcement.

Here, Tatum cannot show overreach like the *Buckeye* defendants because the Ohio forum selection clause existed in all of his contracts with Plaintiff, making lack of notice highly improbable. Moreover, Tatum served first as a consultant and then in a high-level position with Plaintiff, indicating he had "a greater degree of bargaining power or sophisticated knowledge about contract terms" when he was presented with each consulting or employment agreement. *Id.* at *6. Tatum does argue he felt pressured to sign the Severance Agreement terminating his relationship with Plaintiff in August 2023,[7] but that alone is not enough to show overreach, and the forum selection clause contained in the Severance Agreement was the same as those in his prior four agreements. Thus, finding no overreach, this factor weighs in favor of enforcement.

The second factor, public policy of the forum, also weighs in favor of enforcement because Ohio recognizes the validity of forum selection clauses, and enforcement would not be against Ohio's public policy. *See generally Kennecorp,* 610 N.E.2d at 987.

The third factor, whether the selected forum is sufficiently unreasonable, demands a multi-

---

[7]     There are disputed facts about Tatum's separation from Grove Bags. Jack Grover testified it was an amicable separation, while Tatum characterizes it as a surprise termination where he was told to sign the severance agreement on the spot, and 10 minutes before he was scheduled to leave Ohio. (Tr. at PageID 1024–25.) The court need not resolve this factual dispute, however, to conclude that Tatum has not shown overreach.

prong analysis. A finding of unreasonableness requires more than inconvenience to the party seeking to avoid enforcement of the forum selection clause. *inVentiv Health Comm., Inc. v. Rodden*, 108 N.E.3d 605, 612 (Ohio Ct. App. 2018). Instead, the court must find that enforcing the clause would be "manifestly and gravely inconvenient to the party seeking to avoid enforcement such that it will effectively be deprived of a meaningful day in court." *Id.* Thus, the court weighs the following questions to resolve the third factor: "(1) which law controls the contractual dispute; (2) the residency of the parties; (3) where the contract was executed; (4) where the witnesses and parties to the litigation are located; and (5) whether the forum clause's designated location is inconvenient to the parties." *Buckeye*, 2007 WL 641824, at *7 (citing *Barrett*, 589 N.E.2d at 1374–75).

The court has already determined that Ohio law, not Colorado, controls the instant contract dispute. Thus, the first question weighs in favor of enforcement. With regard to questions two through five, the court finds these also weigh in favor of enforcement. Grove Bags is incorporated in Ohio and has its principal place of business in Ohio. (Am. Compl. ¶¶ 1–2.) The company's CEO and CFO, Jack Grover and Dan Jaffe, respectively, also reside in Ohio, and are likely necessary witnesses for litigation. (*Id.* at ¶ 6.) Tatum resides in Colorado and did during his entire time working for Grove Bags. (*Id.* at ¶ 8.) Even so, he traveled to the Grove Bags office in Ohio at least four times a year, as well as to other states where his duties as Chief Commercial Officer required him to be. (Jaffe Prelim. Inj. Decl. ¶ 55.) This semi-regular travel to Ohio indicates litigating in the state is not unreasonably inconvenient to Tatum as a Defendant and possible witness. Lastly, the contracts between Grove Bags and Tatum were executed electronically via Docusign, which only means question three does not weigh one way or the other. (*See* Pl.'s Exs. 2–5.) Although Tatum permanently resides in Colorado, this fact alone does not indicate that enforcing the forum selection

clause would be "manifestly and gravely inconvenient" to Tatum "such that [he would] effectively be deprived of a meaningful day in court." *Rodden*, 108 N.E.3d at 612.

The court concludes that the Ohio forum selection clause included in Tatum's Agreements with Grove Bags is enforceable. As such, Tatum has consented to the personal jurisdiction of this court.

### 2. Defendant Calyx Containers

Unlike Tatum, Plaintiff does not have an agreement with Calyx designating Ohio as the forum state. Thus, Plaintiff must show that personal jurisdiction exists based on Ohio's long-arm statute and constitutional due process.

### a. Ohio's Long-Arm Statute

The Sixth Circuit has explained that "Ohio law does not appear to recognize general jurisdiction over non-resident defendants, but instead requires that the court find specific jurisdiction under one of the bases of jurisdiction listed in Ohio's long-arm statute." *Conn v. Zakharov*, 667 F.3d 705, 717 (6th Cir. 2012).  Thus, the court's analysis of Ohio law is limited to specific jurisdiction under the long-arm statute.

Grove Bags alleges that the court has personal jurisdiction over Defendant Calyx pursuant to Ohio Revised Code §§ 2307.382(A)(1), (4), and (6), which provide, in relevant part, that:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
> (1) Transacting any business in this state;
> [...]
> (4) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed

-26-

> or services rendered in this state;
> [...]
> (6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state;

Ohio Rev. Code § 2307.382(A) (Am. Compl. ¶ 45.) Calyx asserts that the court "need not address Ohio's long-arm statute, and may proceed directly to the due process analysis." (Reply in Supp. of Calyx Mot. to Dismiss at PageID 688, ECF No. 25.) As such, Calyx does not challenge Plaintiff's arguments pertaining to the Ohio long-arm statute. Nevertheless, the court notes that Plaintiff has made a *prima facie* showing that Calyx caused tortious injury in Ohio by an act outside Ohio with the purpose and reasonable expectation of injuring Plaintiff in Ohio pursuant to § 2307.382(A)(6).

Ohio district courts have "generally taken a broad approach" to applying § 2307.382(A)(6). *Schneider v. Hardesty*, 669 F.2d 693, 700 (6th Cir. 2012) (internal quotations omitted). In cases involving alleged misappropriation of confidential and proprietary customer and business information, subsection (A)(6) is generally satisfied. *See CrossCountry Mortg., Inc. v. Messina*, No. 1:19-CV-1021, 2019 WL 5653288 (N.D. Ohio Oct. 31, 2019) (collecting cases finding § 2307.382(A)(6) met when plaintiff alleges the misuse of confidential information by a non-forum defendant who could reasonably expect an injury to occur in Ohio). Similarly, courts have determined that subsection (A)(6) extends to allegations of tortious interference. *See Int'l Confection Co., LLC v. Z Cap. Grp., LLC*, No. 2:18-CV-1108, 2019 WL 4452754, at *3 (S.D. Ohio Sept. 17, 2019) (denying out-of-state defendants' motion to dismiss for lack of personal jurisdiction because plaintiff's tortious interference allegations satisfied long-arm statute and due process); *accord Horter Inv. Mgmt., LLC v. Cutter*, No. 1:15-CV-477, 2016 WL 339927 (S.D. Ohio Jan. 28, 2016). Here,

Plaintiff alleges Calyx misappropriated its proprietary or customer information and tortiously interfered with its business relationships and contracts, especially its contract with Tatum. (*See generally* Am. Compl. at PageID 262–63, 270, 272.) These claims, coupled with Plaintiff's assertions that Calyx reasonably should have known that such conduct would injure Plaintiff in Ohio is enough for the court to find that Plaintiff's claims against Calyx come within the reach of § 2307.382(A)(6) of Ohio's long-arm statute. Thus, the first prong of the personal jurisdiction analysis is met.

b.    Due Process

Due process requires that a defendant possess such "minimum contacts . . . with the forum State . . . such that he should reasonably anticipate being hauled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Such contacts ensure that the exercise of jurisdiction over a defendant "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). There are two forms of personal jurisdiction: general and specific. *Schneider*, 669 F.3d at 701 (citing *Indah v. U.S. S.E.C.*, 661 F.3d 914, 920 (6th Cir. 2011)). The parties' briefings and the court's remarks at the Hearing make clear that the court cannot exercise general jurisdiction over Calyx (Tr. at PageID 872.) Accordingly, the court examines only specific jurisdiction.

The Sixth Circuit analyzes specific jurisdiction using a three-part test:

> (1) First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. (2) Second, the cause of action must arise from the defendant's activities there. (3) Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough

-28-

connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). If any one of these criterion is not met, the court cannot invoke personal jurisdiction over the defendant. *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989). The court addresses each element of specific jurisdiction in turn.

### i.     Purposeful Availment

To determine purposeful availment, the court asks whether Calyx acted or caused a consequence in Ohio such that it invoked the benefits and protections of Ohio law. *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 900 (6th Cir. 2017). Framing purposeful availment this way ensures Calyx could have reasonably anticipated being haled into an Ohio court, and that it is not being brought into Ohio court "solely as the result of 'random,' 'fortuitous' or 'attenuated' contacts." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In *Burger King*, the Supreme Court explained that purposeful availment exists where the defendant creates a "substantial connection" with the forum state, or created "continuing obligations" between the defendant and the forum. 471 U.S. at 475–76 (internal citations omitted).

When a claim involves intentional tortious conduct by an out-of-state defendant, purposeful availment may be shown through application of the *Calder*-effects test. In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that personal jurisdiction over an out-of-state defendant may be proper when their intentional conduct in a non-forum state causes injury to a plaintiff in the forum state. To satisfy the *Calder*-effects test, a plaintiff must show that a defendant "expressly aimed tortious conduct at the forum in question and the brunt of the harm is felt there." *Carrier Corp. v.*

*Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012) (quoting *Calder*, 465 U.S. at 789) (internal quotations omitted).

The Supreme Court and Sixth Circuit have applied the *Calder*-effects test narrowly. In *Walden v. Fiore*, 571 U.S. 277, 279 (2014), the Court held that a Nevada district court could not exercise personal jurisdiction over a Georgia defendant based solely on his knowledge that his alleged tortious conduct would injure the Nevada-based plaintiff. Essentially, *Walden* clarified that even under *Calder*, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. *See also Air Prods. & Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 552 (6th Cir. 2007) ("the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong."). While these applications of *Calder* appear more limited, "the existence of intentional tortious conduct nonetheless 'enhances' a party's other contacts with the forum state for purposes of a purposeful availment analysis." *Air Prods.* at 553.

Calyx has been registered to do business in Ohio since July 1, 2022, and it keeps an agent for service in the state. (Pl. Opp'n to Calyx Mot. to Dismiss Jaffe Decl. ¶¶ 94–95.) Calyx sells its products to Ohio customers and charges them sales tax because it has a "substantial nexus" with the state. (*Id.* at ¶¶ 96–97.) Two percent of Calyx's total revenue comes from its Ohio sales, and it has one Ohio-based employee. (Pl. Opp'n to Calyx Mot. to Dismiss at PageID 479.) Calyx has also regularly directed communications to Ohio through its long-standing relationship with Grove Bags.[8] (Pl. Opp'n to Calyx's Mot. to Dismiss Jaffe Decl. ¶¶ 101–103; Knobel Prelim. Inj. Decl. ¶ 5; Calyx

---

[8]      Simon Knobel describes knowing Grove Bags' leadership both professionally and personally for twelve years. (Knobel Prelim. Inj. Decl. ¶ 5.)

Exs. 1–6; Tr. at PageID 1193–97.) Although Calyx never entered a formal contract with Grove Bags, management of both companies acknowledge they have a business relationship. (Knobel Prelim. Inj. Decl. ¶ 8–10; Pl. Opp'n to Calyx's Mot. to Dismiss Jaffe Decl. ¶ 102.) In addition to these ongoing personal and professional contacts with Ohio, Calyx's president, Alex Gonzalez, met with Jack Grover in 2024 in Cleveland, Ohio to discuss Tatum's ongoing agreements with Grove Bags. (Pl. Closing Br. at PageID 825, Tr. at PageID 934.)

The court finds that Calyx's Ohio operations coupled with its longstanding business and personal relationship with Grove Bags, an Ohio company, demonstrates "continuing obligations" between the Calyx and Ohio. *Burger King*, 471 U.S. at 475–76. Calyx attempts to downplay its Ohio contacts that do not appear connected to their longstanding relationship with Grove Bags, describing its business in the state as "irregular" and that its contacts are not "continuous or systematic." (Calyx Mot. to Dismiss Knobel Decl. ¶ 12.) However, the company's years-long business and personal relationship with Grove Bags and its communications directed at Ohio appear anything but irregular.

Moreover, these contacts are "enhanced" by Calyx's alleged interference with Tatum's non-compete. *See PFG Ventures, L.P. v. Rizzi*, No. 1:20-CV-2183, 2020 WL 7334783 (N.D. Ohio Dec. 14, 2020) (applying *Air Products* to tortious interference claim against out of state defendants). In *PFG Ventures*, the Ohio-based plaintiff company sued its former chief sales officer, a Florida resident, for breach of his non-compete agreement, and two of its out-of-state competitors for knowingly interfering with the former employee's non-compete by deciding to hire him. 2020 WL 7334783, at *1. The court determined that defendant Petty Marketing had purposefully availed itself of Ohio law and that its Ohio contacts were "enhanced" by its alleged interference with the non-compete agreement because its "long-running relationship with Plaintiff PFG, an Ohio corporation,

and Petty Marketing control persons' later decision to later hire Defendant Rizzi with knowledge that it could potentially violate his non-compete should have led Petty Marketing to 'reasonably anticipate being haled into' Ohio court." *Id.* at *3 (quoting *Third Nat. Bank in Nashville v. WEDGE Gr. Inc.*, 882 F.3d 1087, 1089 (6th Cir. 1989)).[9] Like the *PFG Ventures* court determined, this court concludes Calyx should have reasonably anticipated being haled into Ohio court when it decided to hire Defendant Tatum, knowing it could potentially violate his non-compete with Grove Bags, an Ohio company with whom it had a long-running relationship. Therefore, Calyx has purposefully availed itself of Ohio law.

### ii.    Arising From

The court considers next whether Plaintiff's claims "arise from" Calyx's contacts with Ohio. A plaintiff's claim "arises from" a defendant's activities in the forum state when the claims are "made possible by," or "related to" the defendant's contacts with the forum state. *Air Prods.*, 503 F.3d at 553 (collecting cases articulating the Sixth Circuit's standard). The Sixth Circuit characterizes this standard as "lenient" and has further explained that "the cause of action need not 'formally' arise from the defendant's contacts." *Id.* (quoting *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)).

Calyx argues that whatever limited contacts it does have with Ohio, Grove Bags' tortious interference, misappropriation of trade secrets, and civil conspiracy claims do not "arise from" those activities. (Calxy Mot. to Dismiss at PageID 414–15, ECF No. 19 (discussing *Union Home Mortg.*

---

[9]    While the long-running relationship Petty Marketing had with PFG Ventures was in the form of a franchise agreement through which Petty Marketing sold PFG-affiliated products, the parties' agreement ended thirteen months *before* Rizzi left PFG Ventures and began working for PFG's competitor. *PFG Ventures,* 2020 WL 7334783, at *2.

*Corp. v. Everett Fin., Inc.*, No. 1:23 CV 00996, 2023 WL 6465171, at *6 (N.D. Ohio Oct. 4, 2023);

*Midwest Motor Supply Co. v. Nietsch*, 2:22-cv-4049, 2023 WL 8649898 (S.D. Ohio Dec. 14, 2023);

*Total Quality Logistics, LLC v. Tarpon Transportation Servs., Inc.*, No. 1:18CV353, 2019 WL

4413164 (S.D. Ohio Sept. 16, 2019); *Concentrix CVG Corp. v. Daoust*, No. 1:21-CV-131, 2021 WL

1118025 (S.D. Ohio Mar. 24, 2021)).) Generally, these cases illustrate that a court lacks personal

jurisdiction over a non-forum defendant company when the alleged tortious conduct arises from its

hiring of a non-forum defendant employee with whom the Ohio plaintiff company has a non-

compete, non-solicitation, and/or confidentiality agreement.

For example, in *Union Home Mortgage*, the court determined that none of the non-Ohio

defendant company's alleged actions of inducing the Ohio plaintiff's former Florida-based

employees to breach their non-compete agreements, had anything to do with its Ohio contacts.[10]

2023 WL 6465171, at *1, 5. Similarly, the *Midwest Motor* court determined the non-resident

defendant company's hiring of the plaintiff company's former non-resident employees, and its

alleged wrongful use of plaintiff's confidential information did not arise from the defendant

company's single Ohio-based employee. 2023 WL 8649898, at *4. While the facts in these cases are

somewhat similar to those here, neither involves a longstanding business and personal relationship

between an Ohio plaintiff company and a non-forum defendant company like that between Grove

Bags and Calyx. Accordingly, the court turns to cases involving a similar relationship for guidance.

In *Air Products*, a Michigan company sued its former customer, a Kansas company, in

Michigan court for, among other things, fraudulent transfer of assets with an intent to injure the

---

[10]    The limited Ohio contacts the non-Ohio defendant had were a registered agent and
an Ohio branch office accounting for eight of its total employees and
approximately 0.75% of its 2022 annual revenues. 2023 WL 6465171, at *1, 5.

-33-

plaintiff. *Air Products*, 503 F.3d at 549. The district court granted the defendant's motion to dismiss for lack of personal jurisdiction because the plaintiff's causes of action did not "arise from" the defendant's activities in Michigan since they related to a transfer of assets "that occurred wholly outside the state, and the transfer did not involve entities in the state." *Id.* at 553. The Sixth Circuit reversed the district court's decision, explaining that the plaintiff's claims did "arise from" the defendant's Michigan contacts because:

> if Defendants had not engaged in a long-term business relationship with Air Products, they would not have accrued the debt or had a judgment entered against them, and Air Products could have no claim for fraudulent transfer. One element of Air Products' cause of action for fraudulent transfer is that there be a debtor-creditor relationship which, as just explained, was made possible by and would not have existed but for Defendants' business relationship with Air Products.

*Id.* This causal connection coupled with the Sixth Circuit's "lenient standard, that the cause of action need not formally arise from the defendant's contacts," was therefore enough to satisfy the second prong of the personal jurisdiction due process analysis. *Id.* at 554 (internal quotations omitted). The *PFG Ventures* court applied *Air Product's* logic to a tortious interference claim like the one here and determined that the defendant company's efforts to interfere with the plaintiff's former employee's non-compete agreement were made possible by its prior long-term business relationship with the plaintiff company. 2020 WL 7334783, at *4. Thus, the court found there was a substantial connection between the non-forum defendant's Ohio contacts and the plaintiff's tortious interference claim to satisfy the second specific jurisdiction prong. *Id.*

In this case, Grove Bags alleges that Calyx hired Tatum, Grove Bags' former Chief Commercial Officer, knowing Tatum had non-compete, non-solicitation, and confidentiality agreements with Grove Bags, and that such interference would lead to Tatum's breach of those

-34-

agreements. Grove Bags further alleges that Calyx hired Tatum to gain access to Grove Bags' trade secrets related to its packaging materials, pricing, customers, and other confidential information, so that it could use it and Tatum's industry reputation to sell its own flexible packaging product that directly competes with Grove Bags. (Pl. Opp'n to Calyx Mot. to Dismiss Jaffe Decl. at PageID 509–11.) Viewing these allegations in the light most favorable to Grove Bags, the court finds that Calyx's alleged tortious interference with Tatum's restrictive covenants and alleged use of Grove Bags' trade secrets were made possible, at least in part, by its longtime business and personal relationship with Grove Bags, and Ohio company. Thus, Plaintiff has shown that its claims against Calyx "arise from" Calyx's Ohio contacts.

### iii.     Reasonableness

The final prong of the due process analysis is that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach.*, 401 F.2d at 381. In the Sixth Circuit, when the first two elements are met, "an inference of reasonableness arises, and only the unusual case will not meet this third criteria." *Air Products*, 503 F.3d at 554 (cleaned up). The court considers four factors when determining reasonableness: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Id.* 554–55.

Here, because the purposeful availment and arising from prongs are met, there is an inference of reasonableness. Calyx does not directly address the four reasonableness factors, but its CEO states in his declaration that, "Calyx would be burdened if required to defend this action in Ohio. Such burden would arise from out-of-state travel throughout this litigation and additional disruption of

-35-

Calyx's business operations, none of which are located in Ohio." (Calyx Mot. to Dismiss Knobel Decl. ¶ 25.) This burden, however, does not outweigh Ohio's legitimate interest in protecting the business interests of its citizens. Moreover, any argument Calyx makes regarding the effect of Colorado's statutory restrictions on non-compete agreements like that between Tatum and Grove Bags does not weigh in favor of the fourth factor because Calyx does not dispute that Ohio, not Colorado law, applies to the tort claims against it. Accordingly, the court finds that the exercise of personal jurisdiction over Calyx is reasonable.

Because Grove Bags can show that Ohio's long-arm statute and constitutional due process are satisfied, the court concludes that it has personal jurisdiction over Calyx.

## C.      Likelihood of Success on the Merits

Having established that Ohio law applies to Plaintiff's breach of contract claims, and that the court has personal jurisdiction over Tatum and Calyx, the court evaluates Plaintiff's likelihood of success on the merits for each of its substantive claims. When considering this factor of the preliminary injunction analysis, the court must anticipate the outcome of the underlying lawsuit. To do so, the court applies Ohio law to each claim.

The central issue in this case is whether the non-compete clause in Tatum's Agreements is enforceable. This issue underpins Grove Bags' breach of contract claims against Tatum, tortious interference claims against both Defendants, and civil conspiracy claim against both Defendants. Thus, the court first determines whether the restrictive covenant is enforceable under Ohio law.

Ohio courts apply a "reasonableness" standard to restrictive covenants. The party seeking to enforce the covenant must show by clear and convincing evidence that the agreement is (1) "no greater than is required for the protection of the employer," (2) that it does "not impose undue

hardship on the employee," and (3) is not "injurious to the public." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 673 (6th Cir. 2024) (quoting *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)) (cleaned up). Courts evaluate reasonableness on a case-by-case basis, and should consider nine factors during their assessment. *Neate*, 98 F.4th at 673.[11]

The restrictive covenant at issue is an agreement not to directly compete with Grove Bags. The clause provides:

> While employed by the Company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any service to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeting to the hemp and/or cannabis industries.

(Pl.'s Ex. 4 at pg. 4.) In its Motion, Plaintiff asserts its non-compete provision is a reasonable restraint on trade under Ohio law because similar two-year non-compete agreements have been

---

[11]    (1) The absence or presence of limitations as to time and space; (2) whether the employee represents the sole contact with the customer; (3) whether the employee is possessed with confidential information or trade secrets; (4) whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; (5) whether the covenant seeks to stifle the inherent skill and experience of the employee; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the covenant operates as a bar to the employee's sole means of support; (8) whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and (9) whether the forbidden employment is merely incidental to the main employment. *Neate*, 98 F.4th at 673 n. 4.

enforced by Ohio courts. (Pl.'s Motion at PageID 74, ECF No. 5) (citing *PUI Audio, Inc. v. Van Den Broek*, No. 3:21-CV-284, 2021 WL 4905461 (S.D. Ohio Oct. 21, 2021); *Handel's Enters., Inc. v. Schulenburg*, No. 4:18-CV-508, 2018 WL 3077756, at *5 (N.D. Ohio June 22, 2018); *Try Hours, Inc. v. Douville*, 985 N.E. 2d 955, 965–66 (Ohio Ct. App. 2013).) Tatum does not discuss the enforceability of the non-compete clause under Ohio law. Rather, he rests his case on the proposition that Colorado law applies, and because the agreement does not comport with Colorado's requirements, it is void. (Tatum Closing Br. at PageID 830–31.) Calyx also contends the provision is void under Colorado law, but even if Ohio law applied, it would be unenforceable as overbroad.(Calyx Closing Br. at PageID 811–12.)

After hearing from the parties and comparing the non-compete provision to others found enforceable in Ohio, the court finds that the non-compete agreement in Tatum's contracts with Grove Bags is reasonable and enforceable.

First, Plaintiff's business interest in limiting unfair competition after employing Tatum for more than two-and-a-half years in an executive position where Tatum had regular access to confidential information and managed other sales people is legitimate. Ohio does not have a bright-line rule recognizing some business interests as legitimate and others not. *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 907 (S.D. Ohio 2017) (explaining the "danger in trying to formulate black letter law in an area of law that is inherently fact specific). However, Ohio courts have found that an employer has a legitimate business interest in "preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business." *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 528 (6th Cir. 2013) (quoting

*UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068 (Ohio Ct. App. 2001) (internal quotations omitted). Similarly, an employer has a legitimate business interest in "maintaining its ability to 'effectively compete' in the market and in protecting customer relationships." *FirstEnergy*, 521 F. App'x at 528 (quoting *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985 (6th Cir. 2007)).

The parties' briefings and testimony shows Tatum was part of Grove Bags' executive team, serving as the company's Director of Business Development and as the Chief Commercial Officer during his two-and-a-half years with the company. (*See* Pl.'s Exs. 2–4.) Grover testified that Tatum had access to the company's custom pricing information, its Customer Relationship Management ("CRM") tool through which the company managed its current and prospective customer data, and the company's product details allowing Tatum to train and manage the Grove Bags sales team. (Tr. at PageID 900–03.) This information could reasonably be used by Tatum to advantage a competing company, like Calyx. Thus, protecting this information through a non-compete agreement supports Grove Bags' legitimate business interest in "maintaining its ability to 'effectively compete' in the market and in protecting customer relationships." *FirstEnergy*, 521 F. App'x at 528.

The risk of unfair competition is further illuminated by the events leading up to Tatum's eventual employment with Calyx. Initially, the companies operated in separate lanes of the cannabis packaging industry, but they both eventually entered each other's realms. (Knobel Prelim. Inj. Decl. ¶ 16.) In 2021, Grove Bags began "moving into point-of-sale packaging, positioning its MAP film flexible packaging as an alternative to Calyx's rigid packaging for consumer point of sale use." (*Id.* at ¶ 13.) This allegedly caused Calyx to lose several hundred thousand dollars in accounts to Grove Bags. (*Id.* at ¶ 14.) Then, in 2023, Calyx, responding to customer demand, began developing its own

-39-

flexible MAP film products. (*Id.* at ¶¶ 15, 17.) At the Hearing, Knobel testified that over a dinner in December 2023, he told Grover and Jaffe that Calyx was developing new flexible packaging. (Tr. at PageID 1200.) Jaffe also testified about this dinner in which Grove Bags learned about their friend's forthcoming competing product. (Tr. at PageID 1247) Notably, at the time of this December 2023 dinner, Tatum had left Grove Bags, and Calyx had already approached him about joining its team. (Pl. Ex. 18 at ¶ 26.) The timing of Calyx moving into Grove Bags' flexible MAP packaging lane, plus its attempt to hire Tatum shortly after he parted ways with Grove Bags shows that Plaintiff's non-compete agreement advanced a legitimate business interest.

The court also finds that the non-compete agreement is no greater than required to protect Plaintiff's legitimate business interests. The non-compete agreement restricts Tatum's ability to work for a competing packaging company in the United States or Canada for two years following his employment with Grove Bags (August 24, 2023 to August 24, 2025). (Pl.'s Ex. 4 at pg. 4.) Plaintiff argues the provision is not overbroad, as Ohio courts frequently enforce clauses of the same length and geographic scope. (Pl. Mot. at PageID 74.) Tatum only argues the clause is unenforceable under Colorado law, and Calyx argues it is very broad because it covers the entire packaging sales industry in the United States and Canada for two years. (Calyx Closing Br. at PageID 811.)

Ohio courts do not say how long is too long for a non-compete agreement, but numerous courts have upheld provisions that last for two years. *See Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 992 (6th Cir. 2007) (affirming district court decision that a covenant is reasonable for at least two years); *Handel's Enters., Inc. v. Schulenburg*, No. 4:18CV508, 2018 WL 3077756 (N.D. Ohio June 22, 2018), aff'd, 765 F. App'x 117 (6th Cir. 2019) (collecting cases where two year duration is reasonable). Similarly, Ohio courts find that non-compete agreements are not overbroad

despite applying nationwide. *See PUI Audio, Inc.*, 2021 WL 4905461 (collecting cases where nationwide non-compete provisions in the freight industry are reasonable).

These decisions illustrate that the two-year term of Tatum's non-compete agreement is temporally reasonable. Furthermore, while the restriction applies nationwide, and into Canada, this geographic limitation does not make the provision inherently overbroad. Lastly, while the provision applies to the whole packaging industry, it places particular emphasis on cannabis/hemp packaging, and it does not prohibit Tatum from working in other parts of the cannabis industry, such as in the retail sector. During the Hearing, Grover testified that the non-compete did not restrict Tatum's ability to work in other aspects of the cannabis or hemp industry, such as in retail, nor did it apply to non-cannabis substances. (Tr. at PageID 923–24.) Indeed, Grover knew about Tatum's work for a mushroom company, and noted that such work did not conflict with the non-compete agreement. (Tr. at PageID 925.) Tatum also acknowledges that he can and does work for companies outside the cannabis packaging industry. (Tatum Prelim. Inj. Decl. ¶ 12.) Thus, the court finds the first *Raimonde* factor satisfied.

Under the second *Raimonde* factor, the court considers whether the non-compete agreement imposed undue hardship on Tatum. Determining whether a covenant is unduly harsh "requires a much greater standard than determining whether the covenant is merely unfair." *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 706 N.E.2d 336, 342 (Ohio Ct. App. 1997). A showing of "some hardship" is also not enough. *Id.* The court examines undue hardship "by the terms of the agreement at the time it was entered into." *Id.* (quoting *N. Frozen Foods, Inc. v. McNamara*, No. 71378, 1997 WL 691182 (Ohio Ct. App. Nov. 6, 1997) (internal quotations omitted)). Tatum does not address undue hardship directly in his briefings. However, during the Hearing, Tatum testified that his

-41-

employment options were limited due to the restrictive covenants. Employment limitations are not enough to show undue hardship. Moreover, Tatum voluntarily entered into four agreements with Grove Bags, each containing the same restrictive covenants. (Tr. at PageID 1030.) Tatum cannot now claim undue hardship when he knew his employment options would be limited to industries outside of packaging for two years after leaving Grove Bags. Thus, the non-compete agreement does not impose undue hardship on Tatum.

Finally, the court finds that the non-compete agreement is not injurious to the public. This *Raimonde* element primarily deals with the public's interest in promoting fair business competition. *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068 (Ohio Ct. App. 2001) (finding enforcement of non-compete agreement not injurious to public because industry is highly competitive, thus unlikely to adversely affect business competition). Where a non-compete clause "would result in an employer's having a near monopoly for its products or services in a given market, enforcement may be denied on the grounds that it would harm the public." *Brentlinger Enters. v. Curran*, 752 N.E.2d 994 (Ohio Ct. App. 2001). Here, there is no dispute that the cannabis packaging industry is highly competitive. Tatum emphasized that Grove Bags is one of many competing companies "in the one trillion-dollar packaging industry," and that customers will use multiple vendors or frequently change packaging vendors. (Tatum Closing Br. at PageID 827–28.) Given the highly competitive nature of the cannabis packaging industry, enforcement of the instant non-compete agreement is unlikely to adversely affect business competition. Accordingly, the third *Raimonde* element also weighs in favor of enforcement.

Taken together, the court concludes that the non-compete agreement is enforceable because it is reasonable, does not create an undue hardship on Tatum, and enforcement of it would not injure

-42-

the public. Thus, the court turns to the elements of Grove Bags' breach of contract claims.

### 1.    Breach of Contract - Counts I and II

Grove Bags alleges two counts of breach of contract against Defendant Tatum: one for breach of the 2023 Employment Agreement, and one for breach of the Severance Agreement. Plaintiff claims that Tatum breached Section 6 of the EA, which deals with restrictive covenants, when he disclosed Grove Bags' proprietary or confidential information, competed with Grove Bags by working for Calyx, and/or solicited business from Grove Bags' customers. (Am. Compl. ¶¶ 211–12; Pl. Ex. 4.) This conduct also shows breach of the SA because the EA's restrictive covenants were incorporated into Section 10 of the SA. (Am. Compl. ¶¶ 220–22; Pl. Ex. 5.) Tatum relies chiefly on his Colorado law argument to assert that Plaintiff cannot show a likelihood of success on the merits of its breach of contract claims.  (Tatum Opp'n to Prelim. Inj. at PageID 361–64, ECF No. 16; Tatum Closing Br. at PageID 830–31.) But, he argues, if Ohio law does apply, Plaintiff's breach of contract claims still fail because the restrictive covenants are unreasonable, and Plaintiff breached the SA when Jack Grover told Simon Knobel that Tatum was fired for reasons other than those stated in Section 6 of the SA.[12] (Id.)

Under Ohio law, to state a claim for breach of contract, a plaintiff must establish: (1) the existence of a valid contract between the parties; (2) performance by the plaintiff; (3) a breach by the defendant, and (4) resulting damages. *Bihn v. Fifth Third Mortgage Co.*, 980 F.Supp.2d 892, 906

---

[12]    Section 6 of the Severance Agreement deals with how Grove Bags will communicate about Tatum's separation from the company. It reads: "Rayn Tatum is no longer a part of the Grove Bags team. We were very fortunate to have had Ryan help our organization grow and scale over the past 3 years as Grove Bags would not be the company it is today without him. However, he felt it was time to explore other projects and passions. We wish him luck on his new ventures and are excited to continue seeing him as a fixture in the industry." (Pl. Ex. 5.)

(S.D. Ohio 2013) (citing *Pavlovich v. National City Bank*, 435 F.3d 560, 565 (6th Cir. 2006)). When interpreting a contract, the role of a court is to give effect to the intent of the parties. Therefore, "[w]hen the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011).

Because the court has already determined that Ohio law applies and that the non-compete agreement is reasonable and enforceable, the court concludes that Grove Bags has shown the existence of a valid contract between it and Tatum. Grove Bags has also sufficiently alleged damages stemming from Tatum's breach by asserting that Tatum did not return the severance payment despite breaching the agreements. (Pl. Closing Br. at PageID 818, n. 2, ECF No. 42-1.) As for Tatum's alleged breach, evidence presented at the Hearing firmly demonstrates Tatum violated the non-compete agreement when he accepted a consulting job with Calyx. On cross-examination, Tatum conceded that if Section 6(a) of the EA is read literally, without regard to Colorado law, he is violating his agreement with Grove Bags by working for Calyx. (Tr. at PageID 1031.) Thus, Grove Bags has also shown breach by Defendant Tatum.

The only remaining disputed element is Plaintiff's performance. Tatum asserts the affirmative defense of unclean hands based on Grover allegedly telling Knobel that Grove Bags fired Tatum because Tatum was partying too much, doing drugs, and not making sales. (Tatum Closing Br. at PageID 831.) Tatum contends Grover's alleged disparaging comments are a material breach to Section 6 of the SA, and thus Grove Bags has failed to perform its end of the bargain. This argument was not part of Tatum's original briefings in response to Grove Bags' Motion, nor did Tatum assert it in his Motion to Dismiss the Amended Complaint filed prior to the preliminary injunction hearing.

-44-

As such, there is little in the current record to show Tatum's purported defense can overcome the strong evidence Grove Bags has shown regarding Tatum's breach of the non-compete agreement. Moreover, Tatum did not dispute that Grove Bags performed its end of the SA by paying Tatum the agreed-upon severance amount. Accordingly, the court finds that the performance element of an Ohio breach of contract claim is satisfied.

Based on the existing record, the court finds that Plaintiff has shown a strong likelihood of success on the merits of its breach of contract claims.

2. *Misappropriation of Trade Secrets - Count III*

Grove Bags alleges one count of Misappropriation of Trade Secrets against both Defendants. To succeed on a misappropriation of trade secrets claim, a plaintiff must show, "(1) the existence of a trade secret: (2) acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret." *Hoover Transp. Servs, Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003). Under Ohio law, actual or threatened misappropriation of a trade secret may be enjoined. *Dexxon Digital Storage, Inc. v. Haenszel*, 832 N.E.2d 62, 67 (Ohio Ct. App. 2005) (citing Ohio Rev. Code § 1333.62(A)). Thus, a court may grant an injunction even if the plaintiff proves only threatened misappropriation. *Dexxon*, 832 N.E. 2d at 68.

Plaintiff identifies the following as trade secrets: customer information, product information, pricing information, and sales strategies. (Mot. at PageID 76.) During the Hearing, Grover testified that with this information, a competitor could mimic Grove Bags' pricing and go-to-market strategy, understand why the company lost customers or did not obtain a new one, see how customer contracts were won, and see who the company's core customers are. (Tr. at PageID 930.) According to Grover, Tatum would be invaluable to Calyx in its efforts to launch Calyx Cure–a directly competing product

with Grove Bags'. (Tr. at PageID 931.) Grover further testified that Calyx has used Tatum to solicit Grove Bags customers for its own competing product. (Tr. at PageID 932.) Calyx and Tatum argue that these broad categories of trade secrets are insufficient to warrant injunctive relief, and much of the information Plaintiff claims is a trade secret is publicly available on Plaintiff's website and social media. (Calyx Opp'n to Prelim. Inj. at PageID 195; Tatum Opp'n to Prelim. Inj. at PageID 365.)

Ohio law defines trade secrets as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). Put more concisely, "[t]rade secrets are generally thought of as things that give an employer a competitive advantage over another, and as such are extremely coveted." *Dexxon*, 832 N.E. 2d at 66. An employer's customer lists, pricing information, and sales strategies can be trade secrets when the information is provided to employees with limited access, and is password protected. *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000).

In *Avery*, the plaintiff company moved for a preliminary injunction against its former employee who had resigned and started working for a competing company in violation of the employee's non-compete and customer secrecy agreements. *Id.* at 850. One of the plaintiff's claims

-46-

was for misappropriation of trade secrets. *Id.* at 854. The *Avery* court determined that the plaintiff company's customer lists, pricing information, sales strategies, and business philosophy derived independent economic value based on their limited distribution and password protection, and that these factors indicated the company's reasonable efforts to maintain the information's secrecy. *Id.* Thus, the information, although described in broad terms, were trade secrets. *Id. See also Cap. Senior Living, Inc. v. Barnhiser*, No. 3:22-CV-00606-JGC, 2022 WL 6156860 (N.D. Ohio Oct. 7, 2022) (finding plaintiff's characterization of trade secrets sufficient where information fell into categories like those in *Avery*).

Like the *Avery* defendant, Tatum had access to customer lists, pricing information, and sales strategies, and he trained Grove Bags employees on the company's sales and pricing strategy. (Mot. at PageID 76; Tr. at PageID 911.) Tatum also regularly participated in senior leadership meetings where he joined discussions about the company's marketing strategies, financial matters, research and development, future products, strategic objectives, and customer issues. (Tr. at PageID 901–902, ECF No. 49.) This information constitutes "any business information or plans, financial information, or listing of names, addresses, or telephone numbers." Ohio Rev. Code § 1333.61(D). Furthermore, Grove Bags asserts, like the *Avery* plaintiff did, that employee access to this information is limited, and the computer systems maintaining the information are password protected. (Tr. at PageID 51, ECF No. 49.) However, Calyx introduced evidence demonstrating that at least some Grove Bags' information is generally known or readily ascertainable by competitors.

During the Hearing, Calyx introduced numerous exhibits showing how it and Grove Bags would exchange information about their respective sales strategies, job descriptions, and pricing. Calyx Exhibits 4, 8, and 11 show that Grove Bags sent Calyx information about its sales structure,

sales pitches, tiered pricing, and how to promote its product at industry conferences. Pricing information is also generally known or readily ascertainable through Grove Bags' customers who are not obligated to keep the pricing they receive secret from other potential vendors. (Tr. at PageID 990–91.) Additionally, Calyx Exhibit 9 shows Grove Bags publicizing three of its customer relationships on social media. Further challenging Grove Bags' claim that its customer list is a trade secret is the fact that each customer's contact information is published through Cannabiz Media—an online database of publicly available licensing information for United States cannabis companies. (Tr. at PageID 985–86.) Grover acknowledged that its domestic customers are included in the Cannabiz Media database, but he asserted that how Grove Bags uses the database in its broader sales system is a trade secret. (Tr. at PageID 986–91.)

Given the competing testimony on whether Grove Bags' information constitutes trade secrets as defined by Ohio law, the court concludes that Plaintiff has not shown a strong likelihood of success on the merits of its Misappropriation of Trade Secrets claim such that a preliminary injunction is warranted.

### 3. Tortious Interference - Counts IV and V

Grove Bags alleges two tortious interference claims against Defendants: one for tortious interference with business relationships against Tatum and Calyx, and one for tortious interference with contracts against Calyx. Defendants argue that Plaintiff is unlikely to succeed on either.

Ohio law recognizes claims for tortious interference with contract and for interference with a business relationship. *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012). To prove interference with contract, a plaintiff must show "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's

intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Id.* (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 942 (S.D. Ohio 2012) (internal quotations omitted)). The elements for interference with a business relationship mostly mirror those for interference with contract, except "that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Georgia-Pacific*, 701 F.3d at 1102 (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863 (Ohio 1995) (internal quotations omitted)). Additionally, the breach element for tortious interference with a business relation can be shown by the termination of a business relationship. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780 (Ohio Ct. App. 2002).

### a. Tortious Interference with Business or Economic Relations

Grove Bags claims Defendants interfered with its business and economic relationships with its customers and other third parties when Tatum contacted at least one third party in an attempt to use the third party's services for Calyx. (Am. Compl. ¶¶ 239–42.) Further, Grove Bags alleges that but for Tatum, Calyx would not have known of or used this third party's services, and Tatum's knowledge of the third party resulted from his employment with Grove Bags. (*Id.* at ¶¶ 243–44.) Tatum and Calyx argue Plaintiff is unlikely to succeed on this tortious interference claim because it does not show a failure of any business relationship. (Tatum Opp'n to Prelim. Inj. at PageID 366; Calyx Opp'n to Prelim. Inj. at PageID 196.) Moreover, Defendants contend that none of Grove Bags' customers have begun working with Calyx since Tatum joined the company as a consultant. (*Id.*)

In response, Grove Bags maintains that "the Knobel Declaration verifies that Calyx is now offering a product that is directly competing with Grove Bags' product and that Calyx is directly

soliciting this product to Grove Bags' customers. (Knobel Declartion at 16 and 28)."[13] (Pl. Reply in Supp. to Calyx Opp'n at PageID 346; Pl. Reply in Supp. to Tatum Opp'n at PageID 392; *see also* Tr. at PageID 79 (Grover testifying that Calyx has been relentlessly soliciting Grove Bags' customers with their competing product).) However, Plaintiff does not allege in its pleadings, briefings, or hearing testimony that it lost business relationships with those customers, much less that Calyx's alleged interference caused any such loss. At best, all Grove Bags can show is that its customers raised questions after seeing Tatum working with Calyx at the 2024 MJBizCon trade show. (Tr. at PageID 963.) Consequently, the court finds that Grove Bags has not alleged that any of its business relationships with existing customers have terminated. Thus, Plaintiff has not shown a strong likelihood of success on the merits of its Tortious Interference with Business/Economic Relations claim such that a preliminary injunction is warranted against either Defendant.

> **b.**     <u>Tortious Interference with Contract</u>

Grove Bags claims Calyx tortiously interfered in its contracts with Tatum when it hired Tatum despite knowing about Tatum's contractual obligations with Grove Bags. (Am. Compl.

---

[13]     Paragraphs 16 and 28 of Simon Knobel's Declaration state the following:

¶ 16  Although Calyx and Grove Bags' relationship remained amicable at the time, Calyx felt comfortable expanding its products to include flexible MAP film packaging in light of Grove Bags' incursion into the point-of-sale space. Put simply, Grove Bags moved into the point-of-sale lane, Calyx moved into the flexible packaging lane.

¶ 28 Additionally, clients and customers in the cannabis packaging space are open and transparent about pricing. Several of Grove Bags' customers have voluntarily disclosed Grove Bags' prices to Calyx and asked Calyx if it can beat Grove Bags' prices. My understanding is that Grove Bags does not require its customers or clients to sign non-disclosure agreements regarding pricing or otherwise maintain the confidentiality of Grove Bags' prices. (Knobel Decl. ¶¶ 16, 28, ECF No. 8-1.)

¶¶ 250, 254–56.) Calyx argues Plaintiff's tortious interference with contract claim fails because Grove Bags cannot show that Calyx hired Tatum with the intention of inducing him to breach the restrictive covenants in his Agreements. (Calyx Prelim. Inj. Opp'n at PageID 196–97.) Moreover, Calyx asserts it was justified in offering business to Tatum because of its reading of the Colorado non-compete statute and Tatum's warranty in their consulting agreement that he was under no restrictive employment covenants limiting his work for Calyx. (*Id.* at PageID 197.) In response, Grove Bags contends that because Ohio law, and not Colorado, applies to the underlying contract, Calyx's argument fails. (Pl. Reply in Supp. to Calyx Opp'n at PageID 346.)

Having already concluded that Grove Bags and Tatum had an agreement that under Ohio law Tatum breached, the court focuses on whether Plaintiff has shown that Calyx knew of Tatum's Grove Bags contract, that Calyx intentionally induced Tatum to breach the contract, and that Calyx's interference was unjustified. First, the record makes clear that Calyx knew about Tatum's contractual obligations with Grove Bags. At the Hearing, Knobel testified that Calyx made a verbal offer of employment to Tatum in January 2024, and that Calyx's President, Alex Gonzales ("Gonzales") had informally approached Tatum in October 2023. (Tr. at PageID 1151.) Tatum declined both offers, citing his non-compete agreement as the reason for turning Calyx down. (Pl. Ex. 18 at pg. 5–6.) Additionally, Knobel stated that in January 2024, he and Gonzales were reviewing Tatum's Grove Bags contracts to determine whether Calyx could hire Tatum. (*Id.* at PageID 1153.) Further, Grover testified that he had even had a conversation with Gonzales about Tatum's contracts in August of 2024 at an event in Cleveland. (Tr. at PageID 934.) Thus, there appears to be no dispute that Calyx knew about Tatum's contracts with Grove Bags and the non-compete clause contained therein.

With regard to Caylx's intentionality and whether its interference was justified, Calyx argues

-51-

that "it was 'justified' in offering business to Tatum based both on its reading of the plain language of § 8-2-113 and Tatum's warranty in the consulting agreement that he was not bound by any restrictive employment covenants that would preclude his work for Calyx." (Calyx Opp'n to Prelim. Inj. at PageID 197.) Grove Bags contends that Calyx cannot hide behind its purported reliance on Colorado law, especially since Knobel testified that Calyx employed Tatum despite claiming only that the restrictive covenants *may be* unenforceable. (Pl. Closing Br. at PageID 823; Tr. at PageID 1161–62.)

Ohio courts consider the following seven factors when determining if an interference was improper.

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999) (adopting Restatement (Second) of Torts § 767 (1979)). The nature of the actor's conduct is the primary factor in determining whether a third party's interference is improper. *Hicks v. Bryan Med. Grp., Inc.*, 287 F. Supp. 2d 795, 812 (N.D. Ohio 2003). Here, the court finds the *Fred Siegel* factors weigh against Calyx. The record shows that when it initially approached Tatum in late 2023, Calyx had only recently started moving into flexible packaging—Grove Bags' speciality. (Knobel Prelim. Inj. Decl. ¶¶ 15–17.) Moreover, this shift seemed at least somewhat motivated by Grove Bags moving into Calyx's speciality, point-of-sale packaging, such that Calyx lost several thousand dollars in accounts to Grove Bags. (*Id.* at ¶¶ 13–14.) In this context, Calyx's conduct and motive in recruiting Tatum

-52-

within a few months of him parting ways with Grove Bags appears improper, and wholly unconnected to its interpretation of Colorado law. Accordingly, the court finds that Plaintiff has shown a strong likelihood of success on its Tortious Interference with Contract claim against Defendant Calyx.

### 4. *Civil Conspiracy - Count VI*

Grove Bags alleges one count for civil conspiracy against both Defendants. Plaintiff claims Defendants conspired unlawfully to use its trade secrets, interfere with its customer relationships, and hide their employment relationship to avoid litigation and ultimately damage Grove Bags. (Am. Compl. ¶¶ 262–65.) Defendants argue that Plaintiff's civil conspiracy claim fails because (1) it is preempted by the Ohio Uniform Trade Secrets Act ("OUTSA"), (2) Plaintiff has not sufficiently alleged an underlying unlawful act, and (3) it is barred by the intra-corporate conspiracy doctrine. (Calyx Opp'n to Prelim. Inj. at PageID 197; Tatum Opp'n to Prelim. Inj. at PageID 367; Calyx Mot. to Dismiss Am. Compl. at PageID 424–25.)[14] Plaintiff contends it has properly pled a civil conspiracy claim that is neither preempted by OUTSA nor barred by the intra-corporate conspiracy doctrine because the claim is "based on [Defendants] secret plan to violate Tatum's contractual obligations to Grove Bags." (Pl. Reply in Supp. to Calyx Opp'n at PageID 347; Pl. Reply in Supp. to Tatum Opp'n at PageID 393.)[15]

---

[14]    The court refers to Calyx's first Motion to Dismiss (ECF No. 6) because its Opposition Brief (ECF No. 8) to Plaintiff's Motion for Preliminary Injunction (ECF No. 5) incorporates its first Motion to Dismiss arguments.

[15]    The court notes that Plaintiff's Amended Complaint does not state that its civil conspiracy claim is based on Calyx's interference with Tatum's contracts with Grove Bags. Indeed, its claim only references interference with customer, business, and employment *relationships*. Because the court concludes that Plaintiff's tortious interference claim with business or economic relationships is

Under Ohio law, civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty*, 650 N.E.2d at 866 (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987) (quotations omitted). To establish a claim of civil conspiracy, the plaintiff must prove four elements: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519 (6th Cir. 2000) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28 (Ohio Ct. App. 1993)). The malice involved in the tort "is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Fed. Ins. Co. v. Webne*, 513 F. Supp. 2d 921, 927 (N.D. Ohio 2007) (quoting *Pickle v. Swinehart*, 166 N.E.2d 227 (Ohio 1960)).

The court first considers whether Plaintiff's civil conspiracy claim is preempted by OUTSA. The Ohio Uniform Trade Secrets Act displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). OUTSA does not preempt civil remedies "not based on misappropriation of a trade secret." *Id.* In the Sixth Circuit, "courts analyzing whether OUTSA preempts a particular claim must look to whether that claim relies on the same operative facts that formed the basis for the party's trade secret misappropriation claim." *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 414 (6th Cir. 2024). However, when a portion of the claim is supported by an independent factual basis, that portion

---

unlikely to succeed on the merits, it necessarily follows that its civil conspiracy claim would likely fail too because there would be no unlawful act. Nevertheless, the court will construe Plaintiff's civil conspiracy claim as arising from Calyx's interference with Tatum's *contracts* with Grove Bags.

-54-

survives preemption. *Id. See also Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484–85 (6th Cir. 2015).

To the extent that Grove Bags' civil conspiracy claim hinges on its allegations that Defendants misappropriated its trade secrets (*see* Am. Compl. ¶ 262), that part of its claim is preempted by OUTSA. Consequently, for Plaintiff's civil conspiracy claim to survive, it must arise from facts unrelated to those supporting its misappropriation of trade secrets claim. Grove Bags also cannot rely on its tortious interference with business or economic relations claim as the "unlawful act independent from the actual conspiracy" because the court already determined that claim fails. Plaintiff's argument that the underlying unlawful act is Defendants' "secret plan to violate Tatum's contractual obligations to Grove Bags" also cannot rescue its civil conspiracy claim.

Ohio law only recognizes a conspiracy to tortiously interfere with a contractual relationship when the claim "involve[s] two or more non-parties to the contract conspiring to induce a party to breach his contract." *Hicks*, 287 F. Supp. 2d at 814 (quoting *Wagoner v. Leach Co.*, No. 17580, 1999 WL 961166, at *19 (Ohio Ct. App. July 2, 1999) (internal quotations omitted). Such conspiracy claims are limited because "[i]t makes no sense to say that a party conspired to induce himself to breach a contract." *Id.* Here, Grove Bags alleges Tatum conspired with Calyx to breach his own contract with Grove Bags. Thus, because Grove Bags' tortious interference claim involves a party to the contract and only one non-party, its civil conspiracy cannot rest on its tortious interference claim.

Because Grove Bags fails to allege an unlawful act independent of the conspiracy, the court concludes Plaintiff has not shown a strong likelihood of success on the merits of its Civil Conspiracy claim such that a preliminary injunction is warranted.

5.    *Conclusion*

For the foregoing reasons, the court finds that Plaintiff has shown a strong likelihood of success on the merits of its Breach of Contract claims (Counts I and II) against Defendant Tatum, and its Tortious Interference with Contract claim (Count V) against Defendant Calyx. Plaintiff did not show a strong likelihood of success on the merits of its Misappropriation of Trade Secrets (Count III), Tortious Interference with Business/Economic Relations (Count IV), or Civil Conspiracy (Count VI) claims.

**D.    Irreparable Harm**

Turning to irreparable harm, "[t]o merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Memphis A. Philip Randolph Inst.*, 978 F.3d at 391 (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019)). As a general rule, "a plaintiff's harm is not irreparable if it is fully compensable by money damages." *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (quoting *Langley v. Prudential Mortg. Capital Co.*, LLC, 554 F.3d 647, 649 (6th Cir.2009)). On the other hand, the Sixth Circuit recognizes that damage to business reputation and loss of customer goodwill can constitute irreparable harm. *See S. Glazer's Distributors*, 860 F.3d at 852 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)).

Grove Bags argues that if Tatum continues to work for Calyx in violation of the SA and EA, it will suffer irreparable harm. In its Motion and related briefings, Grove Bags points to the leadership role Tatum held in the company, as well as his direct access to confidential information as reasons why money damages would be difficult to calculate. (Mot. at PageID 78.) Calyx contends this alleged harm is insufficient to warrant a preliminary injunction, especially since Grove Bags

-56-

failed to show that such harm resulted in the loss of customers or business, or damage to Grove Bags' reputation in the industry. (Calyx Closing Br. at PageID 807.) Calyx also emphasizes that the harm alleged is "speculative and theoretical" despite nine months passing since Tatum began working for Calyx. (*Id.* at PageID 808.) Tatum echos many of Calyx's arguments, and adds that Grove Bags not moving for preliminary injunctive relief until two months after filing its lawsuit demonstrates unreasonable delay and undercuts its irreparable harm claim. (Tatum Closing Br. at PageID 834.)

In the context of non-competes, the Sixth Circuit observes that, "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) (quoting *Basicomputer*, 973 F.2d at 512) (internal quotation omitted); *see also Office Depot, Inc. v. Impact Office Prods., LLC*, No. 1:09 CV 2791, 2011 WL 4833117, at *12–13 (N.D. Ohio Oct. 12, 2011) (finding the plaintiff demonstrated some irreparable injury stemming from former employees' breach of non-compete). Courts also should consider the future effects of a non-compete clause violation. *Id.* at *13 (quoting *Globe Servs., Inc. v. Palmer*, No. CA 86-02-028, 1986 WL 8909 (Ohio Ct. App. Aug. 18, 1986)). In *Office Depot*, the court determined that the plaintiff showed some actual and threatened irreparable harm "in the form of loss of customer good will, unfair competition, and other unquantifiable harms," stemming from the defendant former employee's breach of a non-compete agreement. 2011 WL 4833117, at *13. The *Office Depot* defendants argued there was no irreparable harm because actual damages resulting from the former employee's breach could be proven. *Id.* However, the court found that the plaintiff's testimony about customers generally, not specifically, no longer working with plaintiff reflected "the difficulty in quantifying harm in the context of non-

compete disputes." *Id.* at *14. Conversely, in *CNG Financial Corporation v. Brichler*, No. 1:21-CV-460, 2021 WL 4189577 (S.D. Ohio Sept. 14, 2021), the court concluded that the plaintiff employer did not show irreparable harm from its former employee's breach of a non-compete agreement because there was no evidence that the plaintiff had suffered a loss of customer goodwill. Rather, the plaintiff relied on an "implied assumption that any breach of a non-compete, regardless of reasonableness, always results in a loss of fair competition." *Brichler*, 2021 WL 4189577, at *14.

Here, the court finds that Grove Bags' evidence of irreparable harm is more analogous to the *Office Depot* plaintiff's. Like the *Office Depot* plaintiff, Grove Bags provided testimony about how Tatum's violation of the non-compete agreement gave rise to customer confusion and potentially unfair competition. At the hearing, Jaffe testified that the harm caused by Calyx using Tatum to push its new flexible MAP packaging that is directly comparable to Grove Bags' product cannot be satisfied by money damages. (Tr. at PageID 1254–55.) Grover testified that "Mr. Tatum's intimate knowledge of our business, products, practices, formulations [...] would put him in a great position [to] team[] up with Calyx to cause irreparable harm to our firm." (Tr. at PageID 969.) Grover further testified that Tatum publicly violating the non-compete agreement also irreparably harms Grove Bags because it sows doubt in the validity of the company's agreements with other employees and even customers. (Tr. at PageID 978–80.) On cross-examination, Knobel conceded that if a former Calyx employee took Calyx's customer list to a competitor, damage beyond money could result. (Tr. at PageID 1180.) Despite Grove Bags not directly naming any customers, this evidence is more than what the *Brichler* plaintiff asserted. Indeed, considering the record as a whole, there is evidence suggesting that Calyx hiring Tatum was part of a larger plan to create and sell a cannabis packaging product that directly competed with Grove Bags'. *See Procter & Gamble Co. v. Stoneham*, 747

N.E.2d 268 (Ohio Ct. App. 2000), cause dismissed, 744 N.E.2d 775 (Ohio 2001) (finding the plaintiff's former employee could use knowledge to destroy the marketability of plaintiff's product). Accordingly, the court concludes that Plaintiff has shown a clear case of irreparable harm.

**E.      Substantial Harm to Others**

The court considers next whether granting an injunction will cause substantial harm to others. This factor requires the court to "balance the harm that [Grove Bags] would face absent an injunction against that which [Calyx and Tatum] would face" if an injunction is granted. *Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 F. App'x 489, 495 (6th Cir. 2018) (quoting *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (internal quotations omitted)). Plaintiff asserts that an injunction will not cause harm to Defendants or third parties because Tatum's absence from Calyx will not interrupt its business, and Tatum knew when he joined Calyx that he would be violating his restrictive covenants with Grove Bags. (Pl. Prelim. Inj. Mot. at PageID 78.) Defendants contend the balance of harms weighs against an injunction because Tatum's livelihood would be threatened if he could no longer work in the packaging or cannabis industry. (Calyx Opp'n to Prelim Inj. at PageID 199; Tatum Opp'n to Prelim. Inj. at PageID 369.) Defendants' argument is not well-taken.

As the court discussed when reviewing the reasonableness of Tatum's non-compete agreement, employment limitations are not enough to show undue hardship. Moreover, the Hearing testimony showed that Tatum was able to work in other industry areas consistent with his background and experience, and that the non-compete provision did not prevent him from working in non-packaging parts of the cannabis industry. (Tr. at PageID 923–24, 1029–30.) This evidence coupled with Tatum's decision to sign four agreements with Grove Bags, each containing the same restrictive covenants, shows he knew the limits of his post-Grove Bags work and could still find

-59-

employment. Resultantly, the court concludes that this factor tips in favor of Grove Bags.

**F.      Public Interest**

Finally, the court finds that public interest does not weigh against injunctive relief. Defendants argue that because Tatum is protected by Colorado law, enforcement of the non-compete would violate the public interest. (Calyx Opp'n to Prelim. Inj. at PageID 199; Tatum Opp'n to Prelim. Inj. at PageID 369.) However, because the court finds that Ohio law applies, Defendants' argument is not well-taken. Instead, the public interest weighs in favor of injunctive relief because the Sixth Circuit and Ohio state courts have recognized that the public has an interest in enforcement of reasonable non-compete agreements. *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964 (6th Cir. 2002); *Alan v. Andrews*, No. 06 MA 151, 2007 WL 1544717 (Ohio Ct. App. May 22, 2007). Thus, the court finds that this factor also weighs in favor of granting a preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, the court grants in part Plaintiff's Motion for a Preliminary Injunction (ECF No. 5). Plaintiff has shown that it has a strong likelihood of success on the merits on three of its six claims; that it would suffer some irreparable harm in the absence of an injunction; that others would not be substantially harmed by the issuance of an injunction; and that the public interest would be served by enforcement.

Pursuant to Civil Rule 65(c), no preliminary injunction should issue without the giving of security by the applicant sufficient for payment of costs and damages as may be incurred or suffered by any party to have been wrongfully enjoined. Accordingly, in order for the injunction to be effective, Plaintiff will be required to file a supersedeas bond in the amount of $50,000 with the court in a form to be approved by the Clerk of the Court in order to compensate the Defendants should it

later be determined that the preliminary injunction should not have been entered.

For the above-mentioned reasons, IT IS ORDERED that Defendants are enjoined as follows: Tatum is enjoined from being employed by, or performing services on behalf of Calyx with or without compensation. Calyx is enjoined from renewing any contractual relationship with Tatum or receiving Tatum's services with or without compensation. Tatum is further enjoined from being employed by, or performing services on behalf of, any other company or its affiliates whose business activities include the manufacturing, marketing, distribution, or sale of packaging including packaging targeting the hemp and/or cannabis industries. The injunction shall commence immediately and should terminate only by further order of the court.[16]

IT IS SO ORDERED.

/S/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT COURT


August 21, 2025

---

[16]    The court acknowledges that the original two-year term of Tatum's non-compete agreement is set to expire on or about August 24, 2025. (Pl.'s Ex. 4 at pg. 4.) However, Ohio law allows courts to enforce a covenant not to compete beyond its expiration. *Rogers v. Runfola & Assoc., Inc.*, 565 N.E.2d 540, 544 (Ohio 1991) (affirming trial court's order enjoining an employee who breached a non-compete covenant for three years from the date of the order, despite it exceeding the non-compete's expiration date); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 513–14 (6th Cir. 1992) (finding the district court erred by modifying the non-compete covenant given *Runfola*'s rejection of the Sixth Circuit's contrary holding in *Moraine Indus. Supply, Inc. v. Sterling Rubber Prods. Co.*, 891 F.2d 133, 135 (6th Cir. 1989)). Accordingly, the injunction may extend beyond the expiration of Tatum's non-compete agreement.

-61-