UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KINZIE ADVANCED POLYMERS, LLC d/b/a GROVE BAGS, | ) | Case No. 1:24 CV 1887 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CALYX CONTAINERS, LLC *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court in the above-captioned case is Plaintiff Kinzie Advanced Polymers, LLC d/b/a Grove Bags' ("Plaintiff" or "Grove Bags") Motion to Compel Against Calyx Containers, LLC with Respect to Calyx Containers, LLC Improper Pesticide Scheme with Michael Ryan Tatum ("Motion to Compel") (ECF No. 79) and Plaintiff's Motion for Civil Contempt and Contempt Sanctions ("Motion for Contempt") (ECF No. 80) against both Defendants. For the following reasons the court grants the Motion to Compel and denies without prejudice the Motion for Contempt.

**I. INTRODUCTION**

The history of this case is well-documented in previous Orders issued by this court. (*See* Prelim. Inj. Order, ECF No. 56; Order on Mot. to Dismiss, ECF No. 61; Order on Mot. to Compel, ECF No. 94.) The instant Motions concern an alleged "pesticide scheme" between Calyx Containers, LLC ("Calyx") and Michael Ryan Tatum ("Tatum") that, according to

Plaintiff, shows Defendants working together in violation of the court's August 21, 2025 Injunction Order. Because of this "scheme," Plaintiff seeks a court order compelling complete responses from Calyx on four discovery requests, and an order finding Defendants in civil contempt for violating the Injunction Order.

Plaintiff filed the Motions on December 2, 2025. (ECF Nos. 79, 80.) Calyx and Tatum filed their respective Oppositions to the Motion for Contempt on December 16, 2025 (ECF No. 82 "Calyx Opp'n for Contempt;" ECF No. 83 "Tatum Opp'n. for Contempt"). Calyx filed its Opposition to the Motion to Compel on December 18, 2025 (ECF No. 84). Plaintiff filed its Reply in Support of the Motion for Contempt ("Contempt Reply," ECF No. 85) on December 22, 2025, and filed its Reply in Support of the Motion to Compel ("Compel Reply," ECF No. 87) on December 26, 2025.

Both Motions are fully briefed and ripe for review.

## II. BACKGROUND

In late August 2024, Tatum signed a Consulting Agreement ("CA") with Calyx. (Prelim. Inj. Order at PageID 1301.) Under the CA, Tatum agreed to provide several services, including "Go-to-Market" Strategy Development, Sales Enablement–such as creating sales collateral and training for sales staff, and Market Analysis by conducting market research and gathering customer feedback. (*Id.*) One of the products Tatum was responsible for marketing was Calyx Cure. (Mot. to Compel at PageID 1771) (citing Dep. Tatum at 111; Dep. Knobel at 238; Dep. Gonzalez at 50).) Calyx Cure is flexible packaging product similar to Grove Bags' TerpLoc product. (Prelim. Inj. Order at PageID 1297.) During Tatum's tenure with Calyx, Calyx advertised Calyx Cure as preventing mold through the following statement:

> Calyx Cure's mold prevention features are designed to maintain the quality and potency of cannabis flower during the curing process. The pouch's moisture-buffering technology holds water vapor in a narrow sweet-spot, reducing over-dry crumble or large moisture spikes, which can lead to mold growth. Additionally, the anti-static film prevents static build-up that can rip trichomes right off the bud, ensuring the flower remains intact and retains its true profile. The UV-screening layer filters out harmful wavelengths that can bleach color and degrade cannabinoids, maintaining the flower's color and potency. Calyx Cure's humidity-buffering technology holds water vapor in a narrow sweet-spot, reducing over-dry crumble or large moisture spikes, which can lead to mold growth[.]

(Mot. to Compel at PageID 1772) (quoting Dep. Tatum at Ex. 39).) Plaintiff says that discovery has shown that Calyx did not conduct tests on Calyx Cure to determine whether it assists in preventing mold. (*Id.*) (citing Dep. Andersson at 97).) Plaintiff further asserts that, based on Calyx's document production, Tatum created Calyx's mold claim when he provided company-wide training to Calyx employees in September 2024. (*Id.*) (citing Decl. Counsel at 18).)

On October 29, 2024, Plaintiff filed a seven-count Complaint (ECF No. 1) against Tatum and Calyx. In it, Plaintiff alleged Breach of Contract - Employment Agreement (Count I) and Breach of Contract - Severance Agreement (Count II) against Defendant Michael Ryan Tatum, as well as Misappropriation of Trade Secrets (Count III), Tortious Interference with Economic and/or Business Relations (Count IV), Civil Conspiracy (Count VI), and Injunctive Relief (Count VII). Plaintiff later filed an Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) (ECF No. 9) on January 10, 2025, asserting the same seven counts, and adding one for Deceptive Trade Practices against both Defendants. (Am. Compl. at PageID 274.)

Prior to filing the Amended Complaint, Plaintiff moved for a preliminary injunction on December 24, 2024 (ECF No. 5). While Plaintiff's Motion for Preliminary Injunction was

pending, Tatum and Calyx along with two other former Grove Bags employees, initiated a lawsuit against Grove Bags in the District Court of Colorado. *See Tatum et al. v. Kinzie Advanced Polymers*, No. 1:25-cv-01321-DDD-CYC (Apr. 25, 2025) ("Colorado Case"). There, Tatum and Calyx sought declaratory judgment that the restrictive covenants in Tatum's contracts with Grove Bags were void and unenforceable under Colorado law. *Id.*, ECF No. 1. Tatum and Calyx were also represented by the same Colorado law firm, 3i Law, LLC.

As the Colorado Case progressed, the court here held a three-day Preliminary Injunction Hearing. (ECF Nos. 33, 35.) Then, on August 21, 2025, the court granted in part, and denied in part Plaintiff's Motion for Preliminary Injunction. (Prelim. Inj. Order, ECF No. 56.) In it, the court enjoined Tatum from being employed by, or performing services on behalf of Calyx with or without compensation, and the court enjoined Calyx from renewing any contractual relationship with Tatum or receiving Tatum's services with or without compensation. (Inj. Order at PageID 1354.) That same day, Calyx terminated its contract with Tatum. (Tatum Opp'n to Contempt at PageID 2023; Calyx Opp'n to Contempt at PageID 1939.)

On September 16, 2025, the Magistrate Judge held a mediation conference with the parties. (Minutes, ECF No. 60.) The session lasted four hours and did not result in a resolution. (*Id.*) At the session, Tatum and his counsel were placed in the same conference room as Calyx and its counsel, as well as Calyx representative, Simon Knobel. (Calyx Opp'n to Mot. for Contempt at PageID 1942.) While together, Knobel learned from Tatum that Calyx's mold prevention statements in its Calyx Cure advertising, specifically "how water activity interact with mold […] should not be stated." (Mot. for Contempt at PageID 1858) (quoting Dep. Knobel at 20.) Accordingly, "out of an abundance of caution," Knobel "removed language related to

mold from Calyx's website in order to properly vet any claims related to mold and gauge the regulatory response to Tatum's whistleblower complaints." (Calyx Opp'n to Contempt, Knobel Decl. ¶ 16 at PageID 1954.) Also, during the mediation session, Tatum discussed his planned whistleblower claims regarding Grove Bags' mold prevention claims. (*Id.*) (quoting Dep. Tatum at 50) ("Simon was made aware that I had found out about this and was going to move forward with the whistleblower claim when discussing it with the attorneys to make sure it wasn't going to impact the lawsuit and that it was legal for me to do, and it was, so I moved forward with it[.]")

Then, at 7:33 p.m. on September 16, 2025, Tatum made a complaint via email to the State of Washington Department of Agriculture ("Washington Complaint"). (*See* Calyx Opp'n to Contempt Ex. 2 at PageID 1965.) The filing included a declaration by Tatum, a complaint form, and a written complaint, including pictures. (*Id.*) Tatum stated the following in his email:

> My name is Michael "Ryan" Tatum, and I am reaching out to bring attention to a pesticidal claim violation against Kinzie Advanced Polymers d/b/a Grove Bags. I request that Washington's pesticide regulatory program investigate Grove Bags…and in-state hydroponic retailer Grow Generation…for marketing TerpLoc cannabis packaging with pesticidal claims—specifically, claims to prevent mold—including the claim printed directly on the bags themselves and that their Terploc film is antimicrobial.
>
> These are fungicidal claims that constitute pesticidal device claims under FIFRA and state law. I have not observed an EPA Establishment Number on the products or images that display these claims, nor while I was employed by the company, and I request that the state verify compliance. As the previous Chief Commercial Officer for Grovebags, I sold customers on Grovebags and Terploc's mold prevention and antimicrobial properties despite multiple customers reporting mold when using Terploc products.

> Because this is a pesticide device sold in-state without a compliant establishment/labeling, we request an immediate Stop-Sale, Use, or Removal Order pending investigation.

(*Id.* at PageID 1969–70); (*see also* Mot. for Contempt at PageID 1858–59) (quoting Tatum Declaration, Dep. Tatum Ex. 37.)

On September 26, 2026, the Department of Agriculture for the State of Washington issued a "Statewide Stop Sale, Use or Removal Order." (Calyx Opp'n to Contempt, Ex. 2 at PageID 1962.) The Washington order prohibited the sale of TerpLoc Bags after investigators found that they were "not registered with the US EPA and bear no EPA Establishment Number on them." (*Id.*) Washington also issued Grove Bags a notice of corrections for "distributing a misbranded device." (*Id.* at PageID 1964.) At that time, Washington also issued a notice of correction to GrowGeneration USA, Inc., which sold TerpLoc Bags, for "operating without a pesticide dealer license," for "no licensed dealer manager on site while distributing pesticides," and for "distributing a misbranded device." (*Id.* at PageID 1964, 1968.)

Then, sometime in early October 2025[1], Tatum filed a complaint with the Colorado Department of Agriculture ("Colorado Complaint") (*See id.* Ex. 3 at PageID 1975). (*See also* Tatum Opp'n to Contempt, Tatum Decl. ¶¶ 3–4, 8, 15.) On October 13, 2025, the Colorado Department of Agriculture issued a "Colorado Pesticide Act Cease and Desist Order" to Cultivate Hydroponics and Garden Supply for violating Colorado regulations by offering TerpLoc

---

1 October 13, 2025, is the date of Colorado's Cease and Desist Order to Cultivate Hydroponics and Garden Supply ordering them to cease distribution of Grove Bags' TerpLoc Pouches. (Calyx Opp'n to Contempt Ex. 3 at PageID 1975.) The Date of violation listed on the order is October 8, 2025. (*Id.*) However, there is no other indication in this document or others attached to the instant Motion to Compel or Motion for Contempt stating when exactly Tatum filed the Colorado Complaint.

Pouches, a "pesticide product or device for sale in Colorado that is not registered with the Department of Agriculture." (Calyx Opp'n to Contempt Ex. 3 at PageID 1975.)

According to Plaintiff, Tatum sent a Declaration about Grove Bags' mold prevention claims to every state with a legal cannabis market. (Mot. for Contempt at PageID 1859) (citing Dep. Tatum at 62); (Mot. for Contempt Ex. 5 at PageID 1918, ECF No. 80-2.) Neither Tatum nor Calyx explicitly deny that allegation in their Opposition Briefs.

In response to the whistleblower complaints, Plaintiff, "[u]pon notice of state order or questions, Grove Bags contacted the agency, remedied the issue, and the orders were released." (Mot. to Compel, Decl. Jaffe ¶ 16 at PageID 1839.) Plaintiff also removed the mold prevention statements from the company's marketing materials following the complaints. (*Id.* ¶ 15.)

After filing the complaints, Tatum sent emails copying Calyx to his and Calyx's Colorado counsel, in which he referenced publicly accessible government documents concerning his whistleblower complaints. (Calyx Opp'n to Contempt, Knobel Decl. ¶ 22 at PageID 1954; Tatum Opp'n to Contempt, Tatum Decl. ¶ 10 at PageID 2032.) Tatum declares that he "did not use those emails, or any communications with counsel, to provide services to Calyx or to assist Calyx in competing with Grove Bags." (Tatum Opp'n to Contempt, Tatum Decl. ¶ 11 at PageID 2032.)

Simon Knobel also took several actions following Tatum's whistleblower complaints. One was submitting requests under the FOIA and related state laws via an online submission platform and under the username "Cannanewsreports" "to gather more information related to Tatum's whistleblower complaints and resulting government investigations." (Calyx Opp'n to Contempt at PageID 1942, Knobel Decl. ¶ 17 at PageID 1954.) According to Plaintiff, there were 18 Calyx FOIA requests published online. (Mot. for Contempt at PageID 1860.)

Knobel also posted about the Grove Bags investigations in online forums and spoke to the media about the issue. Knobel maintains that he "posted on an online cannabis industry forum about the issue in order to gauge awareness and reaction in the industry, and spoke to various media outlets about the issue." (Calyx Opp'n to Contempt at PageID 1943, Knobel Decl. ¶ 18 at PageID 1954.) Plaintiff asserts that in making these posts, Calyx used a website company that permits proposed stories to be submitted to news organizations, and that he used a fake email, grovebagnews@gmail.com, to make the submissions appear as if they were submitted by Grove Bags. (Mot. for Contempt at PageID 1861.) Knobel also posted under different names on cannabis online communication sites, including 420 Magazine, about the investigations. (*Id.*) Knobel ultimately admitted in his Deposition with Plaintiff that he was responsible for the 420 Magazine posts. (*Id.* at PageID 1862) (citing Dep. Knobel at 167.) Plaintiff contends that Knobel's publication efforts were facilitated by the Colorado counsel he shared with Tatum. (*Id.*) (citing Dep. Tatum at 80.)

Plaintiff also reports that the final step of the "pesticide scheme" was Calyx contacting Grove Bags customers, specifically the Colorado-based company, Native Roots. (*Id.* at PageID 1862) (citing Dep. Knobel at 37.) Knobel declares that he contacted Native Roots about the Colorado cease and desist order because his family owns Native Roots, and because the "business could potentially incur liability as a result of using or selling TerpLoc in Colorado…[he]felt obligated to inform [his] family's business of the issue." (Calyx Opp'n to Contempt, Knobel Decl. ¶ 23 at PageID 1955.) Knobel declares that he did not inform any other Grove Bags customers (*id.*) and that he made Calyx's sales team aware of the investigations into Grove Bags "so that (a) they do not make any improper mold claims themselves, and (b) they

are not surprised if a customer asks about government investigations in this area." (*Id.* at ¶ 24.) Plaintiff asserts Knobel advised the sales team that "[w]e've been made aware of a notice that Grove Bags is selling illegal, pesticidal devices." (Mot. for Contempt at PageID 1863) (citing Dep. Gonzalez at 38.)

Finally, Calyx purchased Grove Bags' products to be shipped to Washington. (*Id.* at PageID 1863.) Plaintiff asserts that Calyx testified that the purchase was made to catch Grove Bags in violation of Washington's order. (*Id.*) (quoting Dep. Knobel at 138) ("Q. Why was this purchase made? A. To see if Grove Bags would willfully violate the stop sale order that was in place at the time"). Knobel declares that his ordering of Grove Bags' product to Washington was an "attempt[] to monitor Grove Bags' actions in response to the government investigations and agency orders to determine how they were addressing the issue." (Calyx Opp'n to Contempt, Knobel Decl. ¶ 21 at PageID 1954.) Plaintiff, however, frames it as an example of Defendants utilizing their Colorado counsel "as a conduit to hide the joint efforts." (Mot. to Compel at PageID 1863) (quoting Dep. Tatum at 85, 90–91).

## III. LAW AND ANALYSIS

### A. Motion to Compel against Calyx (ECF No. 79)

In light of the foregoing events involving Tatum's whistleblower complaints and Calyx's publication about the investigations into Grove Bags' mold prevention claims, Plaintiff argues that it "should be able to review the full extent of the scheme to protect its business and remedy false statements[.]" (Mot. to Compel at PageID 1783.) Accordingly, Plaintiff moves for an order compelling Calyx to respond in full to Interrogatory Number 13 and Document Requests 18, 21, and 25. (*Id.* at PageID 1768.) Calyx argues the Motion to Compel should be denied because the

alleged "scheme" is unrelated to Grove Bags' breach of contract, tortious interference with contract, or misappropriation of trade secrets claims. (Opp'n to Compel at PageID 2064.) Furthermore, Calyx points out that when Tatum served discovery requests on Grove Bags that dealt with pesticidal investigation issues, Grove Bags "objected that such requests 'seek[] information that is not relevant to this lawsuit and not likely to lead to the discovery of relevant information.'" (*Id.* at 2065) (quoting Opp'n to Compel Ex A., Frey dec., Ex. 1 pp. 14–15.)

In response, Plaintiff asserts that the discovery sought is relevant to its claims. Specifically, Plaintiff argues that to prove its breach of contract claim against Tatum, it must show that Tatum breached his contracts, which Plaintiff alleges Tatum did by providing services to Grove Bags' competitor, i.e. Calyx, and not protecting Grove Bags' confidential information.[2] (Reply to Compel at PageID 2121.) With regard to its misappropriation of trade secrets claim, Plaintiff argues that Tatum's declarations for his whistleblower complaints improperly rely on his Grove Bags employment and the confidential information he obtained while working there.[3] (*Id.* at PageID 2122; Mot. to Compel Jaffe Decl. ¶ 19 at PageID 1839.) Plaintiff's representative, Dan Jaffe, declares that it was "surprised to learn, through FOIA requests, that Tatum was filing the mold prevention complaints" given "Tatum never raised the issues with Grove Bags." (*Id.*) Additionally, Plaintiff maintains that Tatum is not shielded from liability for his use of Grove

---

2 Under Ohio law, to state a claim for breach of contract, a plaintiff must establish: (1) the existence of a valid contract between the parties; (2) performance by the plaintiff; (3) a breach by the defendant, and (4) resulting damages. *Bihn v. Fifth Third Mortgage Co.*, 980 F.Supp.2d 892, 906 (S.D. Ohio 2013) (citing *Pavlovich v. National City Bank*, 435 F.3d 560, 565 (6th Cir. 2006)).

3 To succeed on a misappropriation of trade secrets claim, a plaintiff must show, "(1) the existence of a trade secret: (2) acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret." *Hoover Transp. Servs, Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003).

Bags' confidential information in his whistleblower complaints because Tatum did not comply with applicable Ohio or Colorado whistleblower statutes. (Reply for Contempt at PageID 2099.) Finally, Plaintiff asserts that Calyx's continued payment of Tatum's legal fees while also utilizing joint counsel to share information about Plaintiff's mold prevention claims supports its tortious interference claim.[4] (Reply to Compel at PageID 2122.) Plaintiff's position is well-taken.

Federal Rule of Civil Procedure 26(b)(1) permits parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case…" FED. R. CIV. P. 26(b)(1). Pursuant to Rule 37(a)(1), when an opposing party fails to produce permitted discovery, "a party may move for an order compelling disclosure or discovery" so long as the movant has "in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." FED. R. CIV. P. 37(a)(1). On a motion to compel, the movant bears the initial burden of showing that the information sought is relevant. *Delta T, LLC v. Williams*, 337 F.R.D. 395, 398 (S.D. Ohio 2021). If the movant satisfies this burden, then the opponent of the motion to compel must show that producing the information would be unduly burdensome. Id. (internal citations omitted).

The Sixth Circuit has determined that "the scope of discovery is within the sound discretion of the trial court." *Pittman v. Experian Info. Sols.*, Inc., 901 F.3d 619, 642 (6th Cir.

---

4 To prove interference with contract, a plaintiff must show "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012) (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 942 (S.D. Ohio 2012) (internal quotations omitted)).

2018) (quoting *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993)). Evidence is discoverable if it is non-privileged and relevant to the claims or defenses of either party or "appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1); *see also Lewis v. AB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). In other words, "a plaintiff should have access to information necessary to establish [its] claim, but [] a plaintiff may not be permitted to 'go fishing[.]'" *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 854 (6th Cir. 2017).

When considering relevance on a motion to compel, the court must decide if "there is *any* possibility that the information sought may be relevant to a claim or defense raised in the litigation." *Transamerica Life Ins. Co. v. Moore*, 274 F.R.D. 602, 609 (E.D. Ky. 2011) (emphasis in original) (cleaned up). Courts should construe "relevance" broadly to include "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Id.* (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). A party's discovery request is considered to be overly broad or unduly burdensome on its face if it "(1) uses an omnibus term . . . and (2) applies to a general category or group of documents or a broad range of information." *Sunless, Inc. v. Palm Beach Tan, Inc.*, No. 5:21 CV 248, 2022 WL 22897429, *4 (N.D. Ohio Sept. 30, 2022) (quoting *Transamerica Life Ins. Co.*, 274 F.R.D. at 609).

*1. Request for Production No. 18*

In document request 18, Plaintiff asks for "[a]ll documents retained on your computer(s), electronic storage device (hard drive, pin drive, etc.) cellular-telephone(s), smartphone, and personal digital assistant(s) (e.g., Palm Pilot, BlackBerry, etc.), including, but not limited to e-

mails, instant messages, or text messages referring, reflecting or relating to the marketing of the Calyx Competing Product." (Mot. to Compel at PageID 1782.)

The court considered document request 18 in its Order on Plaintiff's first Motion to Compel (ECF No. 64). (Order, ECF No. 94.) At that time, the court sustained Calyx's objection that the request was overbroad and encouraged Plaintiff and Calyx to confer and reach an agreement on the documents that align with the relevant time period and issues in the case. (*Id.*) Given the information uncovered during depositions about Tatum's role in marketing Calyx Cure and Calyx's former mold prevention claims, the court now overrules Calyx's objection to document request 18.

To the extent that Calyx has not already produced documents relating to the marketing of Calyx Cure, it is hereby ordered to supplement production, including marketing documents and communications related to Calyx Cure after Calyx and Tatum were enjoined from working together. For those documents and communications involving Defendants' shared Colorado counsel, 3i Law, LLC, Calyx shall, like Tatum did, produce documents and a privilege log related to the mold prevention and pesticide investigations.

*2. Interrogatory 13*

Interrogatory 13 asks Calyx to "[d]escribe with specificity any communications you have had with customers or prospective customers that refer, reflect, or relate to Grove Bags or the Grove Bags Product since August 25, 2023 and, for each such communication, state the persons you communicated with, the form of the communication, the substance of the communication, and the date of the communication." (Mot. to Compel at PageID 1782.) Calyx objected on the

grounds that the request was overly broad, unduly burdensome, seeks irrelevant information, is vague in its instruction, and seeks proprietary information. (*Id.*)

The court also considered interrogatory 13 in its Order on Plaintiff's first Motion to Compel (ECF No. 64). (Order, ECF No. 94.) There, the court overruled Calyx's objection. Accordingly, Calyx is ordered to supplement any discovery it produced in compliance with the court's Order (ECF No. 94). Such supplemental discovery may include, but is not limited to, communications Calyx had that refer, reflect, or relate to the investigations into Grove Bags' mold prevention claims.

*3. Request for Production 21 and 25*

Document requests 21 and 25 seeks "all documents retained on your computer(s), electronic storage device (hard drive, pin drive, etc.) cellular-telephone(s), smartphone, and personal digital assistant(s) (e.g., Palm Pilot, BlackBerry, etc.), including, but not limited to, e-mails, instant messages, or text messages referring, reflecting or relating to" the Grove Bags Product (request 21) and Grove Bags (request 25). (Mot. to Compel at PageID 1782–83.) Calyx objects to these requests as it being overly broad, unduly burdensome, seeks information already in Plaintiff's control, and lacking a temporal limitation. (*Id.* at PageID 1782–83.) That said, Calyx reports producing documents relating to or mentioning TerpLoc and Grove Bags that it found after a reasonably diligent search. (*Id.* at PageID 1783.)

These document requests are analogous to interrogatory 13. As such, the court finds that they are not overly broad and seek highly relevant information to the case. Thus, the court overrules Calyx's Objection, and orders it to supplement discovery such that unproduced documents exist. Such supplemental discovery may include, but is not limited to, documents that

refer, reflect, or relate to the investigations into Grove Bags' mold prevention claims and TerpLoc.

*4. Conclusion*

For the foregoing reasons, the court grants Plaintiff's Motion to Compel Discovery against Calyx (ECF No. 79.) That said, the court expects Plaintiff to cooperate with Calyx and Tatum in responding to their respective interrogatories and document requests about the investigations into Grove Bags' mold prevention claims and pesticide labeling. Calyx is right, Grove Bags cannot in one filing assert the pesticidal investigation issues are irrelevant, and then argue such issues are relevant in another.

**B. Motion for Civil Contempt (ECF No. 80)**

Plaintiff argues Defendants have violated the Injunction Order by "working together to spread misinformation about Grove Bags' products, notifying customers and publicizing to the industry about these misstatements, and attempting to damage Grove Bags' reputation." (Mot. for Contempt at PageID 1852.) Defendants maintain that Tatum has not worked for Calyx since August 21, 2025, the date of the Injunction Order. (Tatum Opp'n to Contempt at PageID 2023; Calyx Opp'n to Contempt at PageID 1939.) Defendants also dispute Plaintiff's characterization of Tatum and Calyx's communications about valid whistleblower complaints as a "scheme" that shows them working together in violation of the Injunction Order. (Tatum Opp'n to Contempt at PageID 2024; Calyx Opp'n to Contempt at PageID 1940–41.)

In response, Plaintiff argues that Tatum is not a whistleblower and did not follow proper whistleblower procedures. (Reply for Contempt at PageID 2098–99.) Moreover, Plaintiff says that the court's Injunction Order enforced Tatum's Grove Bags 2023 Employment Agreement,

which prohibits Tatum's use or disclosure of Grove Bags' confidential information. (*Id.* at PageID 2099.) Plaintiff additionally argues that Tatum made complaints against Grove Bags in bad faith, especially since Tatum could not explain why he only reported Grove Bags but not Calyx, despite similarities in their mold prevention claims. (*Id.* at 2100.) Plaintiff also maintains that Calyx "played a significant role in the scheme," by paying for Tatum's attorney's fees, as well as the fees for three former Grove Bags employees in the Colorado case. (*Id.* at 2101) (citing Dep. Knobel at 251–255.) Ultimately, Plaintiff submits that Defendants have circumvented the plain terms of the Injunction Order by supporting Calyx's litigation efforts under the guise of being a whistleblower. (*Id.*)

To hold a litigant in civil contempt, the movant "bears the burden of proving by clear and convincing evidence that the respondent 'violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.' " *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 550 (6th Cir. 2006) (quoting *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991)). This is not a "light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Elec. Workers Pension Tr. Fund of Loc. Union |58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003). If the movant satisfies its burden, "the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is *presently* unable to comply with the court's order." *Id.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983). In this Circuit, a defendant satisfies its burden by "show[ing] categorically and in detail why he or she is unable to comply with the court's order." *Gary's Elec. Serv.*, 340 F.3d at 379 (internal quotation omitted) (quoting *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996)). Courts also consider

whether "the defendant took all reasonable steps within his power to comply with the court's order." *Gary's Elec. Serv.*, 340 F.3d at 379 (internal quotation omitted) (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)).

In contempt proceedings, "[t]he order in question must be 'definite and specific and ambiguities must be resolved in favor' of the party charged with contempt." *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 643 (6th Cir. 2015) (quoting *United States v. Conces*, 507 F.3d 1028, 1042 (6th Cir. 2007). If there is no ambiguity, then the court "must interpret the district court's decrees "to mean rather precisely what they say." *Paterek*, 801 F.3d at 643 (internal quotation omitted) (quoting *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996)). Ultimately, the Supreme Court has said that "civil contempt should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (internal quotation omitted) (quoting *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885) (emphasis in the original)).

The central issue raised by the parties' arguments is whether Defendants' conduct falls within the scope of "services" Tatum was prohibited from providing Calyx, and Calyx prohibited from receiving. Plaintiff submits that the "Injunction Order's terms preclude Defendants from working together and for Tatum to perform any services for Calyx. There is no grey area – Calyx and Tatum are not to be working together." (Mot. for Sanction at PageID 1854.)

Conversely, Defendants maintain that they complied with the Injunction Order by terminating Tatum's employment with Calyx on August 21, 2025. (Tatum Opp'n to Contempt at PageID 2023; Calyx Opp'n to Contempt at PageID 1939.) As for Tatum's whistleblower complaints, Defendants argue that they are protected by the First Amendment and outside the

scope of the Injunction Order. (Tatum Opp'n to Contempt at PageID 2025; Calyx Opp'n to Contempt at PageID 1946.) Furthermore, to the extent that ambiguity exists around the language prohibiting Tatum from being employed by or performing services on behalf of Calyx, it should be construed in Defendant's favor. (Tatum Opp'n to Contempt at PageID 2026; Calyx Opp'n to Contempt at 1948.)

The court's Injunction Order says the following:

> Defendants are enjoined as follows: Tatum is enjoined from being employed by, or performing services on behalf of Calyx with or without compensation. Calyx is enjoined from renewing any contractual relationship with Tatum or receiving Tatum's services with or without compensation. Tatum is further enjoined from being employed by, or performing services on behalf of, any other company or its affiliates whose business activities include the manufacturing, marketing, distribution, or sale of packaging including packaging targeting the hemp and/or cannabis industries. The injunction shall commence immediately and should terminate only by further order of the court.

(Inj. Order at PageID 1354.) Undoubtedly, Calyx formally terminating its consulting relationship with Tatum on the day of the Injunction Order comports with the Order's command enjoining Tatum from being employed by Calyx, and Calyx from renewing Tatum's contract. But the Order speaks to activities other than the type of employment relationship Tatum and Calyx had up to the date of the Injunction. For instance, it broadly contemplates services performed by Tatum and received by Calyx "with or without compensation."

So, what does "services" include? Black's Law Dictionary defines "service" as: "Labor performed in the interest or under the direction of others; specif[ically], the performance of some useful act or series of acts for the benefit of another, usu[ally] for a fee <goods and services>." *Service*, BLACK'S LAW DICTIONARY (12th ed. 2024). Based on this definition, are Defendants'

actions the type of "services" the Injunction Order prohibits? On the one hand, Plaintiff's evidence could be construed as showing that Tatum performed "some useful act" for Calyx's benefit when he shared his plan to file whistleblower complaints about Grove Bags' mold prevention claims during the September 16, 2025 mediation. (*See* Mot. for Contempt at PageID 1858) (quoting Dep. Tatum at 50) ("Simon was made aware that I had found out about this and was going to move forward with the whistleblower claim when discussing it with the attorneys to make sure it wasn't going to impact the lawsuit and that it was legal for me to do, and it was, so I moved forward with it[.]") The record also shows that he filed the Washington Complaint around 7:30 p.m. on September 16, 2025, the same day as the mediation session. (*Id.* at PageID 1969.) Tatum's decision to submit the complaints less than a month after the Injunction Order and the same day as the mediation, is a coincidence at best, and suspicious at worst.

Similarly, Knobel's deposition testimony that, while participating in the September 16, 2026 mediation conference, he learned from Tatum that Calyx's mold prevention statements in its Calyx Cure advertising, specifically "how water activity interact with mold […] should not be stated," (*Id.*) (quoting Dep. Knobel at 20), arguably demonstrates Calyx receiving a benefit from Tatum's "useful act." (*See also* Calyx Opp'n to Contempt, Knobel Decl. ¶¶ 14–16 at PageID 1953–54) ("I became aware of Tatum's whistleblower complaints as a result of the September 16, 2025 mediation held in this case…") As for Knobel's actions following Tatum's complaints, this conduct too is suspicious. Plaintiff cites deposition testimony from Knobel that makes Knobel's publication of Tatum's complaints and their results appear intentional and coordinated. (Mot. for Contempt at PageID 1860–61.) Also quite curious is Knobel's decision to purchase Grove Bags' products to be shipped to Washington State following its issuance of a Stop Sale,

Use or Removal Order, which Knobel testified he did "[t]o see if Grove Bags would willfully violate the stop sale order that was in place at the time[.]" (*Id.* at PageID 1863) (quoting Dep. Knobel at 138.)

On the other hand, Tatum declares that he filed the complaints in his personal capacity, and "did not submit them at the request of Calyx, on Calyx's behalf, or as part of any agreement, plan, or coordination with Calyx." (Tatum Opp'n to Contempt, Tatum Decl. ¶¶ 3, 5–6 at PageID 2031.) Similarly, Tatum states that the emails he sent to Colorado counsel, copying Calyx, on the status of his complaints, referenced publicly accessible government documents, and that he "did not use those emails, or any communications with counsel, to provide services to Calyx or to assist Calyx in competing with Grove Bags." (*Id.*, Tatum Decl. ¶¶ 10–11 at PageID 2032.)

Likewise, Knobel declares that he posted on an online cannabis industry forum about the complaints and the results of the investigations and spoke to various media outlets "in order to gauge awareness and reaction in the industry[.]" (Calyx Opp'n to Contempt at Knobel Decl. ¶¶ 18, 20 at PageID 1954.) Knobel also states that by ordering Grove Bags' product to Washington after the State issued its Stop Sale, Use or Removal Order, he was "attempt[ing] to monitor Grove Bags' actions in response to the government investigations and agency order." (Calyx Opp'n to Contempt at Knobel Decl. ¶ 21.)

Given these conflicting assertions, and that Plaintiff has not presented evidence that under Ohio's and Colorado's whistleblower statutes Tatum acted in a way that totally vitiates his alleged whistleblower status, the court finds that Plaintiff's evidence in support of the Motion for Contempt comes up just short of the higher clear and convincing standard.

There is no doubt that Tatum and Calyx have continued some kind of relationship following the court's Injunction. Plaintiff clearly presented some evidence from which one might conclude that Tatum was performing a service to benefit Calyx by letting Calyx know he was planning to file whistleblower complaints about Plaintiff's mold prevention claims—claims Tatum appears to have advised Calyx to make in respect to Calyx Cure, in September 2024. But the record is less clear as to the facts and circumstances leading up to Tatum making Calyx aware of his plan to file complaints with state agencies about Grove Bags' mold prevention claims. Similarly, it is unclear when Calyx knew that its own claims about mold prevention may be out of compliance with state regulations. These questions about the full extent of Tatum's and Calyx's communications, if any, prior to the September 16, 2025 mediation, are why the court cannot conclude that Plaintiff has carried its heavy burden to show by clear and convincing evidence that Defendants violated the court's Injunction Order.

Accordingly, Plaintiff's Motion for Contempt and Contempt Sanctions is denied without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the court grants Plaintiff's Motion to Compel against Calyx (ECF No. 79) and denies Plaintiff's Motion for Contempt and Contempt Sanctions (ECF No. 80) against Defendants without prejudice.

Calyx is hereby ordered to fully respond to Interrogatory 13 and Requestions for Production 18, 21, and 25. For those responsive documents and communications involving Defendants' shared Colorado counsel, 3i Law, LLC, Calyx shall, like Tatum did, produce documents and a privilege log related to the mold prevention and pesticide investigations.

Additionally, the court expects Plaintiff to cooperate with Calyx and Tatum in responding to their respective interrogatories and document requests about the investigations into Grove Bags' mold prevention claims and pesticide labeling.

Lastly, the court's decision on Plaintiff's Motion for Contempt should not be read as an indication that the evidence presented could not show by a preponderance of the evidence that Tatum breached his contracts, Calyx tortiously interfered in Plaintiff's contract with Tatum, or that Defendants misappropriated Plaintiff's trade secrets. On the contrary, the court's decision on Plaintiff's Motion to Compel reflects the relevance of the new information to Plaintiff's existing claims. Nor should the court's denial of the Motion for Contempt be read as indicating that the information is not pertinent to new claims, if any, that Plaintiff may bring if allowed by the court.

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

September 24, 2026